Lewis DUNCAN, individually and as personal representative of the Estate of Patrick Duncan, deceased, et al., Plaintiffs and Petitioners,

v.

UNION PACIFIC RAILROAD COMPANY, a corporation; State of Utah; Paul Kleinman; and Does 1 through 100, inclusive, Defendants and Respondents.

No. 900233.

Supreme Court of Utah.

April 6, 1992.

Rehearing Denied Dec. 24, 1992.

Michael A. Katz, Salt Lake City, for Lewis Duncan and Patrick Duncan.

J. Clare Williams, Larry A. Gantenbein, Salt Lake City, for Union Pacific R.R.

Paul Kleinman, Stephen J. Sorenson, Craig L. Barlow, Allan L. Larson, Anne Swensen, Salt Lake City, for State of Utah.

HOWE, Associate Chief Justice:

We granted certiorari to review the court of appeals' decision which affirmed the trial court's grant of summary judgment in favor of all defendants. *Duncan v. Union Pacific R.R.*, 790 P.2d 595 (Utah Ct.App. 1990).

A complete statement of the facts is contained in the court of appeals' opinion, and we will here briefly restate the most significant of them. On April 9, 1983, at about 8:50 p.m., an automobile driven by Patrick Duncan containing three passengers was struck by a Union Pacific freight train. All four persons in Duncan's car were killed. The accident occurred in rural Tooele County on Droubay Road, which is essentially a straight two-lane road running north and south through the county. The rails traverse Droubay Road at an angle of slightly over 43 degrees on the north and 136 degrees on the south. The Duncan car approached the crossing from the south at the oblique angle of 136 degrees. Three warning signs were in place at the time of the accident: a railroad advance warning sign (a circular yellow sign with a large black X and R) located 305 feet from the crossing, and two on either side of the road (white cross-bars with "railroad crossing" printed in black letters) located 19 feet from the crossing. No active warning device, such as flashing lights or an automatic gate, was in place. However, nothing obstructed a motorist's view of the tracks for several thousand feet.

Plaintiffs brought this wrongful death action on behalf of the four occupants. The trial court awarded summary judgment to Union Pacific and its engineer, Paul Kleinman, on the ground that as a matter of law, they were not negligent and to the State of Utah on the ground of governmental immunity. The court of appeals affirmed.

## DUTY OF UNION PACIFIC

Plaintiffs assail the court of appeals' decision in favor of Union Pacific on the basis that the court did not apply the proper standard of care to the railroad to protect highway motorists crossing its tracks. Plaintiffs concede that the State, through its Department of Transportation (UDOT), not Union Pacific, has the authority to determine at which crossings automatic warning lights and gates shall be installed and maintained under Utah Code Ann. §§ 54-4-14 to -15.1. However, plaintiffs argue that UDOT's responsibility under the statute should not relieve Union Pacific from the duty to petition and urge UDOT to upgrade the adequacy of the warning signs at dangerous crossings because it is Union Pacific who is or should be aware of the danger. Plaintiffs further suggest that in extreme cases a railroad should have the duty to bring suit to compel UDOT to do so.

The court of appeals properly observed that under our case law a railroad cannot be held liable for crossing conditions unless the crossing is "more than ordinarily hazardous." *Duncan v. Union Pacific R.R.*, 790 P.2d at 598 (citing *Bridges v. Union Pacific R.R.*, 26 Utah 2d 281, 488 P.2d 738 (1971); *English v. Southern Pacific Co.*, 13 Utah 407, 45 P. 47 (1896)). The court of appeals further explained:

In the case of railroad crossings, the costs of eliminating the hazard, such as by installing overpasses at all railroad crossings, including rural ones, does not warrant a duty of care so rigorous that simply having a railroad cross a street is tortious. Rather, for a railroad to be liable for a crossing mishap, there must be something about the railroad's right of way that creates a hazard to motorists greater than the hazard presented by the simple fact that the railroad and the street intersect.

*Duncan*, 790 P.2d at 599. In the instant case, the trial court found that the crossing was not "more than ordinarily hazardous" because plaintiffs could not demonstrate, or even suggest, what more Union Pacific

could have done to make this crossing safer, short of installing automatic warning lights and signs and gates, which admittedly was not its responsibility.

In *English v. Southern Pacific Co.*, we pointed out that a crossing might be found to be more than ordinarily hazardous if it was in a thickly populated portion of a city; if the view of the tracks was obstructed because of the railroad itself or because of natural objects; if the crossing was frequented by heavy traffic so that approaching trains could not be heard; or if, for any reason, devices employed at the crossing were rendered inadequate to warn the public of the danger of an approaching train. *English*, 13 Utah at 419–20, 45 P. at 50. Recently our court of appeals found a crossing more than ordinarily hazardous and held the railroad liable for a crossing accident because it had allowed wild vegetation on the right-of-way to obscure the vision of oncoming trains from approaching motorists. *Gleave v. Denver & Rio Grande Western R.R.*, 749 P.2d 660 (Utah Ct.App.1988). The cost of removing the vegetation was minimal compared to the public benefit of being able to see an approaching train.

■ Plaintiffs' contention that Union Pacific should have a duty to petition, urge, and even bring suit against UDOT to compel it to improve the adequacy of the warning devices at a crossing is unavailing. Active warning devices are funded 90 percent from federal funds and 10 percent from the entity with jurisdiction over the highway in question. Federal funding is generally available only for eight to ten projects in Utah each year. UDOT has developed and uses a hazard index rating approved by the Federal Highway Administration as one means of determining the priority of crossings for upgrading the adequacy of warning devices presently in place. UDOT's team, with the railroad and local government representatives, makes on-site inspections of crossings throughout the state, using the hazard index. Priorities are then established, based on the degree of hazard found at the crossings surveyed. In view of this careful and orderly approach to the safety problem at crossings, we decline to impose a duty on railroads to circumvent that process by petitioning, urging, or bringing suit against UDOT to change the order of its prioritizations.

On Utah's roads and highways, there are more than 1,000 railroad crossings which lack active warning devices. Requiring a railroad to petition UDOT in order to improve the signage at one crossing without considering whether a greater hazard exists at other crossings would make little sense. The Droubay Road crossing had been inspected by UDOT and assigned a priority rating. Other crossings inspected at that time were given a higher priority rating because the potential hazard was thought to be greater than that of the Droubay crossing. The public is better served by a system such as that devised by UDOT, which takes into consideration all the crossings in Utah. We conclude that the court of appeals did not err in affirming the summary judgment in favor of Union Pacific.

## IMMUNITY OF THE STATE

■ The court of appeals affirmed the summary judgment granted in favor of the State under the authority of its earlier decision in *Gleave v. Denver & Rio Grande Western Railroad*, 749 P.2d 660 (Utah Ct. App.1988). That case held that UDOT was immune from suit in determining the type of warning devices which should be required at railroad crossings. The determination of UDOT was held to be the exercise of a discretionary function for which immunity has been reserved by Utah Code Ann. § 63–30–10(1)(a). The court, in turn, relied upon our decision in *Velasquez v. Union Pacific Railroad*, 24 Utah 2d 217, 469 P.2d 5 (1970), where we held that the alleged failure of the public service commission (which at that time had the responsibility now reposed in UDOT) to require more adequate warning devices at a railroad crossing involved the exercise of a discretionary function for which immunity had not been waived. *Gleave*, 749 P.2d at 669. In *Velasquez*, we emphasized the statutory directive to the public service commission,

which was to prescribe the installation of "appropriate" safety or other devices, and held that this language indicated a legislative intent to confer discretion on the commission in discharging that statutory duty. 24 Utah 2d at 219, 469 P.2d at 6.

Plaintiffs now contend that *Velasquez v. Union Pacific* should be overruled because our later decision in *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980), narrowed governmental immunity. Plaintiffs urge that UDOT's decision to defer any improvement in the warning device at the Droubay Road crossing was an *operational* rather than a *discretionary* decision and that *Velasquez* has been overruled sub silentio by three later decisions of this court. We will consider these contentions in order.

Our decision in *Standiford v. Salt Lake City* did not in any way impinge upon our prior decision in *Velasquez*. In *Standiford,* we clarified and narrowed the type of activities carried on by governmental entities which could properly be termed "governmental functions." In the instant case, plaintiffs do not contend that UDOT's duty to determine the type of warning devices to be placed at a particular crossing is not a governmental function. *Standiford* did not deal with the further issue of whether, in the exercise of a governmental function, a particular duty is discretionary or operational.

Plaintiffs' contention that UDOT's decision to defer improving the adequacy of warning devices at a crossing is an operational decision and not a discretionary one must fail. As pointed out earlier in this opinion, UDOT utilizes a surveillance team to evaluate the level of the hazards to motorists at hundreds of crossings where active warning devices are not in place. This team assigns priorities to those crossings where the greatest hazards exist. UDOT then upgrades the warning devices at those crossings with the highest priority until the limited available funds have been exhausted. Crossings with a lower priority must await financing for another year.

Furthermore, UDOT's operation meets the four-step test for a discretionary function outlined in *Little v. Utah State Division of Family Services,* 667 P.2d 49, 51 (Utah 1983). First, a basic governmental objective is involved—the promotion of public safety at railroad crossings. Second, the evaluation of crossings and the assigning of priorities for upgrading the adequacy of warning devices now in place are essential to the improvement of public safety. Third, UDOT exercises "basic policy evaluation, judgment and expertise" in utilizing a surveillance team to weigh the degree of hazard at the crossings it inspects and to subsequently assign priorities to those crossings where the greatest hazard exists. Fourth, UDOT has the necessary statutory authority to determine which crossings are most hazardous and most deserving of the limited funds available for active warning devices.

The duties of UDOT are not unlike those of the defendants in *Rocky Mountain Thrift v. Salt Lake City,* 784 P.2d 459 (Utah 1989), who had the responsibility to determine the design, capacity, and construction of a drainage system to carry away flood waters. In that case, we pointed out:

> Decisions made by defendants before the flood regarding the design, capacity, and construction of their flood control systems are the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern. These areas would include geological, environmental, financial, and urban planning and developmental concerns, and financial concerns, just to name a few.

*Id.* at 463. We reaffirm our holding in *Velasquez* that the duties imposed upon UDOT in these particulars are truly discretionary functions and are therefore protected by governmental immunity.

Our decisions in *Bigelow v. Ingersoll,* 618 P.2d 50 (Utah 1980), *Bowen v. Riverton City,* 656 P.2d 434 (Utah 1982), and *Richards v. Leavitt,* 716 P.2d 276 (Utah 1985), have not eroded our holding in *Velasquez*. In *Gleave v. Denver & Rio Grande Western Railroad,* a similar contention was made but rejected by the court of appeals. 749 P.2d at 669. In *Bigelow v. Ingersoll,* two automobiles collided at a highway intersection due to an improperly

synchronized traffic light which allowed the plaintiffs to make a left turn in front of an oncoming vehicle which also had a green light. 618 P.2d at 53. Obviously, there was a malfunction which was completely unintended and unanticipated and did not result from the exercise of anyone's judgment. In *Bowen v. Riverton City,* two automobiles collided at an intersection because a stop sign had either fallen down or been knocked down. We held that Riverton City had a nondelegable duty to maintain its traffic signals in a reasonably safe, visible, and working condition. 656 P.2d at 437. We remanded the case for a factual determination of whether Riverton City was negligent in not responding sooner to notice it had received that the sign was down, since an earlier response might have prevented the accident. Again, in that case Riverton City did not contend that it had any discretion as to whether the stop sign should be promptly replaced. The city's duty was clear, and the only question was whether it responded reasonably once it had notice of the hazard. In *Richards v. Leavitt,* suit was brought against a city for negligently allowing trees, shrubs, and other growth to obscure the vision of motorists at an intersection and negligently failing to maintain a stop sign. 716 P.2d at 277. Our holding in a per curiam decision was simply that the maintenance of traffic control devices on streets is a governmental function and the presentation of a timely notice of claim under Utah Code Ann. § 63–30–13 was mandatory. 716 P.2d at 279. We did not have occasion to reach the question of what constitutes a discretionary function.

We find no error in the court of appeals' opinion and sustain its affirmance of the trial court's judgment.

HALL, C.J., and ZIMMERMAN, J., concur.

STEWART, Justice: (Dissenting).

The Court holds that Union Pacific has no duty to upgrade the safety devices at a railroad crossing where four people were killed. The majority overturns 100 years of Utah case law holding railroads to a duty of care with respect to crossings without explanation or the slightest acknowledgment of its existence. The Court attempts to justify its extraordinary theory that a railroad has no duty to install adequate warning devices at dangerous crossings on the ground that the authority to require the upgrading of warning devices rests solely with the Utah Department of Transportation ("UDOT"). The Court also holds UDOT immune from suit. In addition, even though UDOT can require railroads to upgrade warning signs at unsafe crossings without an expenditure of state money, the Court holds that because UDOT lacks sufficient federal funding to upgrade safety devices at all railroad crossings on its list, UDOT owed no duty to plaintiffs to require more effective warning devices. I submit that summary judgment in favor of Union Pacific and UDOT was wrong as a matter of law. Accordingly, I dissent.

I

I first address whether UDOT is immune from suit.[1] The majority holds UDOT immune from suit on the ground that evaluating and assigning priorities for upgrading the adequacy of warning devices at railroad crossings is a discretionary function under Utah Code Ann. § 63–30–10(1)(a). Although that proposition may be correct, the issue in this case is not UDOT's failure to make a decision to upgrade the warning signals at the Droubay crossing, but rather, UDOT's failure to implement the deci-

---

**1.** We stated in *Ferree v. State,* 784 P.2d 149 (Utah 1989), that sound reason and simplicity require analyzing and applying negligence concepts before deciding issues of sovereign immunity because such an analysis avoids "having to make difficult decisions with respect to the difficult discretionary exception doctrine in sovereign immunity cases. Deciding an immunity question first may lead to unwarranted assump-

tions and confusion about undecided duty problems." *Id.* at 153.

For the sake of organizational clarity, however, I first analyze the governmental immunity issue. But my departure here from *Ferree* is not intended to undermine the policies just stated. Because I hold below that UDOT does have a duty to plaintiffs, the sovereign immunity issue must be addressed anyway.

sion it had already made. The majority also ignores the fundamental mode of analysis for governmental immunity previously outlined by this Court and thus reaches its conclusion without following the necessary two-step test as set forth in the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38. *See Provo City Corp. v. State,* 795 P.2d 1120, 1123–24 (Utah 1990); *see, e.g., Bennett v. Bow Valley Development Corp.,* 797 P.2d 419, 421–22 (Utah 1990); *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.,* 784 P.2d 459, 462–63 (Utah 1989); *Metropolitan Finance Co. v. State,* 714 P.2d 293, 294 (Utah 1986) (per curiam); *see also Duncan v. Union Pac. R.R.,* 790 P.2d 595, 602–03 (Utah Ct.App.1990) (Jackson, J., concurring).

As Judge Jackson correctly stated in his concurring opinion below, before addressing whether § 63–30–10(1)(a) waives immunity, the court must first determine whether the activity in question is a governmental function under Utah Code Ann. § 63–30–3 (Supp.1983). *Duncan,* 790 P.2d at 602. Section 63–30–3, as it read at the time plaintiffs' cause of action arose, grants immunity for governmental functions exercised by governmental entities, subject to

exceptions provided elsewhere in the Immunity Act.[2] Thus, the threshold inquiry in a governmental immunity case is whether the activity complained of is a governmental function, for if it is not, there is no immunity. If, however, the activity is a governmental function, then the court must determine whether provisions of the Act have waived immunity.

Remarkably, the majority fails to make this threshold inquiry, but instead assumes, without any analysis, that the exercise of UDOT's authority in this case is a governmental function. The majority attempts to justify its assumption by stating that "plaintiffs do not contend that UDOT's duty to determine the type of warning devices to be placed at a particular crossing is not a governmental function." This statement incorrectly implies that plaintiffs have failed to raise the issue. The issue before this Court is whether UDOT is immune from suit, and that issue can be resolved only after deciding the governmental function question. The problem is not that plaintiffs failed to raise the threshold issue, but rather, that the parties, the lower courts, and the majority have failed to apply the appropriate legal analysis.[3]

---

**2.** In *Standiford v. Salt Lake City Corp.,* 605 P.2d 1230, 1237 (Utah 1980), we narrowly defined a governmental function as an activity so unique in nature "that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." In 1987, however, the Legislature enacted § 63–30–2(4)(a), which broadly defines a governmental function as

> any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

Utah Code Ann. § 63–30–2(4)(a) (1989).

Although this section appears to overrule *Standiford* in that it makes any act by a governmental entity a governmental function, I have previously observed that the Utah Constitution imposes limits on the Legislature's authority to immunize all governmental actions from suit, particularly when those actions fall clearly outside traditional governmental activities. In *Condemarin v. University Hospital,* 775 P.2d 348,

372 (Utah 1989) (Stewart, J., concurring), I stated that the test in *Standiford* identifies "where the constitutional right of a person to have a remedy for personal injury begins under Article I, section 11 of the Utah Constitution as against a governmental agency, and where the governmental right to immunity from such lawsuits stops." However, the question of the scope of the State's authority to immunize its own nongovernmental activities need not be reached in this case because plaintiffs' cause of action arose in 1983, four years prior to the enactment of § 63–30–2(4)(a) in 1987. Accordingly, *Standiford* and its progeny apply to this case.

**3.** The faulty analysis advanced by the majority and the parties may be due in part to this Court's decision in *Velasquez v. Union Pacific Railroad,* 24 Utah 2d 217, 469 P.2d 5, 6–7 (1970), which held that the Public Service Commission's decision on what type of warning device to install at a railroad crossing is a discretionary function for which immunity had not been waived. However, *Velasquez* did not address whether the activity was a governmental function, perhaps because *Velasquez* was decided before *Standiford.* Clearly, under post-*Standiford* cases, *Velasquez* did not employ the correct legal analysis.

Moreover, plaintiffs' erroneous assumption that UDOT's duty in this case is a governmental function does not excuse this Court from employing the proper legal analysis.

Applying that analysis clearly shows that UDOT is not immune from suit, because the activity at issue is not the exercise of a governmental function. In *Standiford v. Salt Lake City*, 605 P.2d 1230, 1236–37 (Utah 1980), this Court defined a governmental function as an activity which is "of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." In *Johnson v. Salt Lake City Corp.*, 629 P.2d 432, 434 (Utah 1981), we elaborated on this definition: "The first part of the *Standiford* test—activity of such a unique nature that it can only be performed by a governmental agency—does not refer to what government *may* do, but to what government alone *must* do." (Emphasis in original.) Thus, the initial issue to be answered in this case is whether the evaluation, installation, maintenance, and improvement of safety signals or devices at railroad crossings is so unique that it is something government alone must do.

Previously, we have applied the *Standiford* test to hold that the following activities are not governmental functions: the operation of a golf course, *Standiford*, 605 P.2d at 1237; the maintenance of a sewage system, *Thomas v. Clearfield City*, 642 P.2d 737, 739 (Utah 1982); the supervision of the disbursement of escrow funds, *Cox v. Utah Mortgage and Loan Corp.*, 716 P.2d 783, 785 (Utah 1986); and the maintenance of a water storage tank, *Bennett v. Bow Valley Development Corp.*, 797 P.2d 419, 422 (Utah 1990). In contrast, we have applied *Standiford* to hold that the following activities are governmental functions: supervision of a financial institution, *Madsen v. Borthick*, 658 P.2d 627, 631 (Utah 1983); review and approval of a land developer's plat, *Loveland v. Orem City Corp.*, 746 P.2d 763, 775–76 (Utah 1987); licensing of motor vehicles and maintenance of public records of title and ownership, *Metropolitan Finance Co. v. State*, 714 P.2d 293, 294 (Utah 1986) (per curiam); and maintenance and repair of traffic signs on streets,

*Richards v. Leavitt*, 716 P.2d 276, 279 (Utah 1985) (per curiam).

In the instant case, UDOT has the statutory duty to "provide for the installing, maintaining, reconstructing, and improving of automatic and other safety appliances, signals or devices at grade crossings on public highways or roads over the tracks of any railroad or street railroad corporation in the state." Utah Code Ann. § 54-4-15.1 (Supp.1983). Statutory authority alone, however, does not make an activity a governmental function for purposes of immunity. We noted in *Thomas v. Clearfield City*, 642 P.2d 737, 739 (Utah 1982), that even though the Legislature may establish an activity as a governmental function for purposes of the agency's authority to operate, "it does not follow from this that the function automatically qualifies for governmental immunity as 'essential to the core of governmental activity.'" Nor does it follow that statutory authority makes an activity one that government alone must perform.

In fact, both the State and the railroads have historically participated in installing and maintaining warning devices at crossings. Union Pacific acknowledged this fact to the trial court in its reply memorandum for summary judgment, stating, "[T]he Railroad has always 'participated in' and cooperated with UDOT in 'implementing changes and improvements to railroad crossings' in the past." Indeed, nearly 100 years ago, this Court expressly recognized the duty of both the State and the railroad to provide adequate warning devices at dangerous crossings:

> [I]t is clear that, while the statutes of Utah make some provision for the safety of the public while crossing tracks when crossing over the public thoroughfares in thickly-settled communities or cities, yet these statutes will not relieve the railroad company from adopting such other reasonable measures for the public safety as common prudence may dictate, considering the danger, locality, travel, and surrounding circumstances of the case. The reason of such rule is founded in the common law that every one must so con-

duct himself and use his own property as that, under ordinary circumstances, he will not injure another in any way, if such injury can reasonably be avoided by the use of reasonable care.... In the crossing of this particular street, where the travel is shown to be great, and the danger in crossing to be greater, we are of the opinion that reasonable care and prudence would require that a flagman be kept constantly at the crossing during the time that trains continue to cross over it, or that gates should be erected and controlled so as to lessen the danger of injury to passengers and travelers, and thus lessen the danger caused by the almost constant use of the tracks by the defendants and their trains.

*English v. Southern Pac. Co.*, 13 Utah 407, 45 P. 47, 50 (1896). Similarly, in *Bridges v. Union Pacific Railroad*, 26 Utah 2d 281, 488 P.2d 738, 739 (1971), we acknowledged a railroad's common law duty to warn the public of dangerous crossings. Because a railroad, at least until now, has been held to a duty to install adequate warning devices at dangerous crossings, it is hardly realistic to argue that that activity is a function the State alone must do. The railroad's common law duty in itself is sufficient to make the placement of adequate warning devices a nongovernmental function.

This proposition is supported by previous decisions in which we have held that activities capable of being performed by nongovernmental entities or individuals are not governmental functions. In *Thomas v. Clearfield City*, 642 P.2d 737 (Utah 1982), for example, we held that maintenance of a sewage system is not a governmental function because it is not mandatory that a governmental entity collect and dispose of sewage:

> In many rural and recreational areas in our state, individual homeowners or small clusters of homes legally provide their own sewer services with septic tanks. Large developments having common ownership, such as condominiums or trailer courts, currently can and do provide their own collection and disposal of sewage, subject to government standards for pollution control and public health.

*Id.* at 739. For the same reason, in *Bennett v. Bow Valley Development Corp.*, 797 P.2d 419 (Utah 1990), we held that the operation of a water system was not a governmental function. We reasoned, "In many areas of our state, residents maintain wells and provide their own water. Also there are privately owned companies supplying water to residents." *Id.* at 422.

The instant case is closely analogous to the activities at issue in *Thomas* and *Bennett* because, even though government can install safety devices at railroad crossings, the railroad can and has installed and maintained such devices. Furthermore, Utah Code Ann. §§ 54–4–15.1 and 54–4–15.3 (Supp.1983) clearly allow UDOT to delegate this function to the railroad, again indicating that this is an activity a nongovernmental entity can perform.

Since this activity is delegable and can be performed by an entity other than government, it cannot be a governmental function under *Standiford* and *Johnson*. I would hold, therefore, that UDOT is not immune from suit in this case.

Nevertheless, even assuming the activity in this case is a governmental function, the activity is not, as the majority maintains, a discretionary function for which immunity has been waived. A decision whether to require an upgrading of warning signals at a crossing arguably constitutes a discretionary function; however, plaintiffs' complaint against UDOT is not that UDOT made the wrong decision, but rather, that UDOT failed to *implement* the decision to upgrade the warning devices at the Droubay crossing. Policy decisions are generally considered to be discretionary functions for which immunity has not been waived. However, this Court has observed more than once that the implementation of a policy decision is an operational, not a discretionary, act and, as such, is undeserving of the discretionary function protection. *See, e.g., Doe v. Arguelles*, 716 P.2d 279, 282 (Utah 1985) (duty to implement policy decision on whether and how to release juvenile delinquent); *Little v. Utah State*

*Division of Family Servs.*, 667 P.2d 49, 51–52 (Utah 1983) (failure to properly evaluate foster home, supervise placement of infant, and protect infant from harm is a breach of conduct implemental in nature); *Bigelow v. Ingersoll*, 618 P.2d 50, 53 (Utah 1980) (design of traffic control system does not involve the "basic policy making level"); *Frank v. State*, 613 P.2d 517, 519–20 (Utah 1980) (one-on-one dealings between physician and patient take place at the implementing/operational level, not at the policy-making level). In *Doe v. Arguelles*, 716 P.2d 279 (Utah 1985), a probation officer decided to release Arguelles, a juvenile offender with a history of sexual violence toward children, into the community. The officer conditioned release on Arguelles' attending weekly therapy sessions, with a professional counsellor. Arguelles attended only four therapy sessions and three months after his release, sodomized and stabbed a fourteen-year-old girl. We noted that the State would be immune from suit for the probation officer's decision to release the juvenile into the community because that decision is a discretionary function. *Id.* at 282. However, we held that the discretionary function protection did not extend to the officer's failure to monitor Arguelles' treatment after release because "[a] decision or action implementing a preexisting policy is operational in nature and is undeserving of protection under the discretionary function exception." *Id.* at 283.

In this case, UDOT decided to upgrade the warning signals at the Droubay crossing prior to the decedents' accident. UDOT's failure to implement that decision goes beyond the status of a discretionary function deserving of protection under § 63–30–10(1)(a).

UDOT defends its failure to implement its decision on the basis of limited federal funding. It argues that the decision to delay implementation necessarily involved discretionary decisions regarding the allocation of limited resources. This assertion, which the majority facilely accepts, hides a fundamental fact. This case involves much more than the allocation of limited resources: UDOT has other courses of action

open to it that do not involve reliance on federal funding for warning devices.

A review of Title 54 of the Utah Code establishes that UDOT has a duty to the public to promote public safety at railroad crossings and that UDOT may delegate that responsibility to the railroad. Section 54–4–15.1 imposes a duty on UDOT, "so as to promote the public safety ... [to] provide for the installing, maintaining, reconstructing, and improving of automatic and other safety appliances, signals or devices at grade crossings on public highways...." However, under section 54–4–15.3, UDOT "shall apportion the cost of the installation, maintenance, reconstruction or improvement of any signals or devices described in section 54–4–15.1 between the railroad or street railroad and the public agency involved." Under this statutory scheme, therefore, UDOT, in carrying out its obligation to promote public safety at railroad crossings, clearly could have required Union Pacific to pay for and install upgraded signals at the Droubay crossing. In fact, according to Union Pacific's own statements to the trial court, UDOT has already delegated the responsibility and expense of maintaining safety devices exclusively to the railroad.

Since UDOT could have delegated the installation and expense of warning signals to Union Pacific, UDOT should not now be able to raise limited resources and lack of funding as a defense. Such a defense would be clearly unacceptable in cases where government has a nondelegable duty, such as repairing sidewalks, *Murray v. Ogden City*, 548 P.2d 896 (Utah 1976), or maintaining streets, *Bowen v. Riverton City*, 656 P.2d 434, 437 (Utah 1982). If lack of funding should not excuse governmental action in nondelegable duty cases, it certainly should not excuse governmental action when the duty is delegable.

Under the circumstances, a jury could very well find that UDOT breached its duty to implement the decision to install warning devices at the Droubay crossing, not because it failed to allocate funding, but because it did not require installation of the devices by Union Pacific. I would there-

fore remand this case for a trial on whether UDOT was negligent.

## II

I turn next to whether the railroad has a duty to upgrade warning devices at the Droubay crossing. Contravening nearly 100 years of case law, the majority essentially holds that UDOT's statutory responsibility to determine the appropriate warnings to be installed at crossings absolves Union Pacific's common law duty to install warning signals at overly hazardous crossings. The majority bases its holding on the assumption that UDOT's authority in this area is exclusive. As noted above, that premise is incorrect.[4]

The majority observes:

[T]he trial court found that the crossing was not "more than ordinarily hazardous" because plaintiffs could not demonstrate, or even suggest, what more Union Pacific could have done to make this crossing safer, short of installing automatic warning lights and signs and gates, which admittedly was not its responsibility.

As I have already shown, this Court has traditionally imposed a common law duty on the railroad to exercise reasonable and due care, including providing safety devices or flagmen and sounding bells and whistles at more than ordinarily hazardous crossings, despite UDOT's statutory authority. *See English v. Southern Pac. Co.*, 13 Utah 407, 45 P. 47, 50 (1896); *Bridges v. Union Pacific R.R.*, 26 Utah 2d 281, 488 P.2d 738, 739 (1971); *see also* Utah Code Ann. § 56–1–14 (Supp.1983) (locomotives must be equipped with bells or whistles and must sound them within eighty rods of each crossing). In fact, *Bridges* held that a jury could find a railroad negligent for not taking additional precautions, such as installing adequate signaling devices, if the crossing is more than ordinarily hazardous as a

result. *Bridges*, 488 P.2d at 739. Other jurisdictions have also placed this duty on railroads. *See, e.g., Stromquist v. Burlington Northern, Inc.*, 112 Ill.App.3d 37, 67 Ill.Dec. 629, 632, 444 N.E.2d 1113, 1116 (1983) ("[I]rrespective of orders or proceedings of Illinois Commerce Commission, a railroad has common law duty to provide adequate warning devices at its railroad crossings."); *Central Indiana Ry. v. Anderson Banking Co.*, 252 Ind. 270, 247 N.E.2d 208, 211 (1969) (better rule is majority rule which allows jury to determine whether crossing was extra hazardous such that railroad has duty to warn traveling public); *Stevens v. Norfolk & Western Ry.*, 171 Ind.App. 334, 357 N.E.2d 1, 4 (1977) (if, under all circumstances, grade crossing is extra hazardous, railroad can be found negligent for its failure to adequately protect the public from danger by providing warnings and taking safety precautions in addition to those required by statute).

The majority inexplicably abrogates this long-standing and well-recognized duty, stating only that UDOT's statutory authority to determine which crossings should have automatic warning lights and gates absolves Union Pacific of any duty. The fact that one party has a duty, however, does not preclude another party from having a concurrent duty. I would hold that Union Pacific has a duty to upgrade warning signals at overly hazardous crossings.

## III

Since I would hold that both UDOT and Union Pacific have a duty to install warning devices at overly hazardous crossings, the final issue to be resolved is whether plaintiffs raised an issue of material fact regarding whether the Droubay crossing was overly hazardous. I believe that plaintiffs have done so. *English* set forth sev-

---

**4.** Section 54–4–15(2) originally stated, "The [Public Service] [C]ommission shall have the *exclusive power* to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection ... of each crossing of a public road or highway by a rail-

road...." Utah Code Ann. § 54–4–15(2) (1953) (emphasis added). However, in 1975, the Legislature deleted the term "exclusive" and changed "commission" to UDOT. The section now begins, "The department shall have the power to determine and prescribe...." Utah Code Ann. § 54–4–15(2) (Supp.1983).

eral possibilities for more than ordinarily hazardous crossings:

> that [the crossing] is in a thickly-populated portion of the town or city; or that the view of the track is obstructed, either by way of the company itself or by other objects proper in themselves, or that the crossing is a much-traveled one, and the noise of approaching trains is rendered indistinct, and the ordinary signals difficult to be heard, by reason of bustle and confusion incident to railway or other business; or by reason of some other such like cause....

*English*, 45 P. at 50. *Bridges* further outlined the standard:

> To authorize a jury to find negligence on the part of the railroad in not taking additional precautions, there must be evidence to indicate that the crossing was more than ordinarily hazardous, i.e., there must be something in the configuration of the land, or in the construction of the railroad, or in the structures in the vicinity, or in the nature or amount of the travel on the highway, or in other conditions, which renders the warning employed at the crossing inadequate to warn the public of danger.

*Bridges*, 488 P.2d at 739 (citing *Gant v. Chicago & N.W. Ry.*, 434 F.2d 1255, 1258 (8th Cir.1970).

In the instant case, plaintiffs allege that the crossing was more than ordinarily hazardous because the angle at which the tracks cross Droubay Road makes it difficult for a driver to judge the distance and speed at which a train is approaching the crossing. The majority, the Court of Appeals, and the trial court all ignored this allegation because plaintiffs' expert affidavit was apparently based in part on faulty information. The record, however, contains additional evidence supporting plaintiffs' allegation. For example, the accident report of the investigating officer states that he went to the accident scene on April 14, 1983, at 1 a.m. and made the following observations:

> At night it is harder to estimate speeds. Parking my vehicle in the travel lane going North @100 feet from the tracks, I estimated the speed of the train. At that angle to the train, it was very difficult to judge the speed of the train. I estimated the speed of the train @45 mph and felt sure I had time to cross the intersection. On radar stationary, the train was traveling at 70 mph, I would not have made it through the intersection if I had tried.

The record also contains evidence that trains often crossed at speeds of 70 mph and that four school buses and 580 cars travelled the crossing every day. Furthermore, the record clearly shows that prior to the accident, UDOT had determined that the crossing was sufficiently dangerous to warrant automatic warning signals and gates, which is strong evidence that the Droubay crossing is overly hazardous. In sum, these are all facts which a jury would consider in determining whether this crossing was more than ordinarily hazardous.

We have often held that negligence or the lack of negligence should not be decided on summary judgment except in the most clear-cut cases. *See Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983); *Apache Tank Lines, Inc. v. Cheney*, 706 P.2d 614, 615 (Utah 1985). In the instant case, the record demonstrates that an issue of fact exists regarding the hazardousness of the Droubay crossing. Therefore, I believe plaintiffs should be able to present their case to a jury.

## IV

In conclusion, I believe the majority opinion incorrectly analyzes this case and grossly misapplies or ignores our previous decisions. The result unjustly denies recovery to the plaintiffs in this case and to all future plaintiffs who find themselves similarly situated. I therefore cannot join the majority and believe that this case should be remanded for a trial.

DURHAM, J., concurs in the dissenting opinion of STEWART, J.