Kelly Baker **FERREE** and Kelly Baker Ferree as Guardian Ad Litem for Rachel Lynn Ferree, a minor child, Plaintiffs and Appellants,

v.

**STATE** of Utah; Department of Social Services; Division of Corrections; Utah State Prison; Board of Corrections; Board of Pardons; Community Correction Centers; William V. Milliken; S.L. Dibella; Thomas R. Harrison; Robert E. Anderson; L.W. Morris; Roger Pray; Dan Williams; John Does and/or Jane Does I through X; and Mrs. Cheryl Ferguson, Defendants and Appellees.

No. 870014.

Supreme Court of Utah.

Dec. 4, 1989.

Lorin N. Pace, G. Randall Klimt, Salt Lake City, for plaintiffs and appellants.

R. Paul Van Dam, Stephen J. Sorenson, Salt Lake City, for defendants and appellees.

STEWART, Justice:

The plaintiffs are the widow and the surviving child of Dean A. Ferree. They brought this action for his wrongful death. Ferree was killed by Terrence Lee Ferguson while Ferguson was on a weekend release from the Bonneville Community Corrections Center ("Center") in Salt Lake City, Utah. The plaintiffs allege that the State, through its corrections officers, was reckless, negligent, or grossly negligent in the supervision and release of Ferguson from the Center from May 20 to May 23, 1982, and that Ferree's brutal death by bludgeoning at the hands of Ferguson was a direct and proximate result of the defendants' conduct. The trial court entered summary judgment against the plaintiffs on the ground that the defendants owed no duty of care to the deceased and that the action was barred by sovereign immunity. This appeal followed.

Prior to his incarceration at the Utah State Prison for burglary in November, 1980, Ferguson committed a total of twenty-eight known offenses over fifteen years, eleven as a juvenile and seventeen as an adult. The offenses were not violent; rather, they were property and drug crimes.

Ferguson was placed on probation three times during his criminal career and each time failed to comply with his probation conditions. In a presentence report dated March 17, 1978, an investigator concluded that prior attempts at probation had not been beneficial. Furthermore, Ferguson had a long history of substance abuse and was addicted to morphine, Demerol, cocaine, and alcohol. Although he had participated in various treatment programs and had taken antabuse at the Utah State Prison, Ferguson has not coped successfully with his addictions.

While at the prison, two psychological assessments were made of Ferguson. The first, performed in 1978, indicated that Ferguson "still doesn't seem to quite realize the seriousness of the antisocial direction his life is taking." The second, in 1980, stated that Ferguson was an impulsive person who by his own admission acted without thinking and whose ready anger at even minor obstacles caused him to engage in antisocial acts. A psychologist wrote that he was skeptical about the depth of Ferguson's motivation for treatment.

Nevertheless, Ferguson was eventually admitted to the Bonneville Community Corrections Center, a so-called half-way house, run by the State Department of Corrections. To enter the Center, Ferguson was required to take antabuse daily, although the Center had no reliable procedure for verifying the administration of antabuse. Two months prior to the homicide, Ferguson and a fellow inmate became drunk to the point of unconsciousness on the Center's grounds. There were also reports of his use of stolen drugs during his work absences, but urinalysis confirmed only traces of alcohol.

Ferguson was granted a two-day release to the custody of his mother on May 21, 1982, to attend a wedding. He checked in personally with the Center the evening after the wedding, as required, and was again released into his mother's custody.

Ferguson's counselor, a co-defendant, was the attendant on duty, and he had no recollection of administering antabuse to Ferguson that day.

During the early morning hours of May 23, Ferguson, while intoxicated, bludgeoned Ferree to death with a pipe. Ferguson's blood alcohol level was substantially in excess of the statutory threshold for drunken driving. There was no evidence that Ferguson was previously acquainted with the victim.

## I. STANDARD OF REVIEW

On appeal from a summary judgment, this Court resolves only legal issues, and we do not, therefore, defer to the trial court's rulings. We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact. *Bushnell Real Estate, Inc. v. Nielson*, 672 P.2d 746, 749 (Utah 1983); *Bowen v. Riverton City*, 656 P.2d 434, 436 (Utah 1982).

## II. NEGLIGENCE

To establish negligence or gross negligence, a plaintiff must first establish a duty of care owed by the defendant to the plaintiff. *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986); *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986); *Prosser & Keeton on the Law of Torts* § 30, at 164 (W. Keeton 5th ed. 1984). Duty is "a question of whether the defendant is under any obligation for the benefit of a particular plaintiff...." *Prosser & Keeton, supra*, § 53, at 356–57. The issue of whether a duty exists is entirely a question of law to be determined by the court. *Weber*, 725 P.2d at 1363; *Prosser & Keeton, supra*, § 37, at 236.

■ For a governmental agency and its agents to be liable for negligently caused injury suffered by a member of the public, the plaintiff must show a breach of a duty owed him as an individual, not merely the breach of an obligation owed to the general public at large by the governmental official. *Obray v. Malmberg*, 26 Utah 2d 17, 19, 484 P.2d 160, 162 (1971) (failure of sheriff to investigate a burglary held not actionable). *Christenson v. Hayward*, 694 P.2d 612 (Utah 1984), held that deputies who stopped but did not arrest an intoxicated motorcyclist prior to his fatal accident had no duty to the deceased to remove him from the highway. The Court held that there were no circumstances in that case that justified imposing a specific duty of due care on the police toward a specific individual. By contrast, *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983), held that the Division of Family Services assumed a specific duty of due care to provide proper care for an autistic child when placed in a foster home. The Division breached that duty by not supervising adequately her placement and by not supplying appropriate protective head-gear after receiving reports of the child's compulsive headbanging episodes.

To adopt plaintiffs' theories would impose too broad a duty of care on the part of corrections officers toward individual members of the public. It would expose the state to potentially every wrong that flows from the necessary programs of rehabilitation and paroling of prisoners. Given the increases in prison populations, the effect could well be to burden corrections officials and chill legitimate rehabilitative programs. Parole and probation programs are subject to occasional tragic failures because of the frailties of human nature and the imprecision associated with predicting violent human conduct, but they are also practically indispensable. The public interest would not be served by imposing liability on corrections officials and the state for the uncertain success that attends parole and probation programs.

Other jurisdictions have generally held that corrections officials, in releasing prisoners or placing them on parole, have no duty toward persons in the general public, absent special circumstances. Thus, in *Anthony v. State*, 374 N.W.2d 662 (Iowa 1985), corrections officials were held to have no duty to the rape victim of a work-release inmate, even though the inmate had

a prior history of sex crimes. Similarly, *Thompson v. County of Alameda,* 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), held that state officials had no duty to warn the parents of a parolee's murder victim, even though the parolee had exhibited prior violent propensities against young children and had indicated that he would, if released, "take the life of a young child residing in the neighborhood." 27 Cal.3d at 746, 614 P.2d at 730, 167 Cal.Rptr. at 72. In *Thompson,* the court found the parolee's threat against a non-specific victim too ambiguous to impose a duty to warn the police or other state officials. *See also Donahoo v. State,* 479 So.2d 1188 (Ala. 1985); *Sherrill v. Wilson,* 653 S.W.2d 661 (Mo.1983); *Moore v. Commonwealth, Dep't of Justice,* 114 Pa.Commw. 56, 538 A.2d 111, *appeal granted,* 520 Pa. 610, 553 A.2d 971 (1988).

This case is even less compelling for liability than the cases cited above. The plaintiffs here presented no evidence that Ferguson had previously exhibited violent behavior toward another or that he had physically threatened another. For these reasons, the cases cited by the plaintiffs establishing a duty on the part of corrections officials to control "dangerous" persons within their custody are inapposite.

Nevertheless, when officials have good reason to believe that a particular person may be jeopardized by the release of a prisoner who has demonstrated capacity for violence, the result may be otherwise. For example, *Division of Corrections v. Neakok,* 721 P.2d 1121 (Alaska 1986), involved a parolee who had been previously convicted and sentenced for assault and rape. One of the parolee's counselors had indicated that the parolee would pose a physical threat to his stepdaughters, one of whom was an eventual victim, after release. The parolee was released unsupervised into the small community where his troubles first began. Given those circumstances, the court held that there was a threat of injury to a reasonably foreseeable potential victim by a clearly "dangerous" individual and that these facts gave rise to a duty of due care on the part of the state and its employees. *See also Grimm v.*

*Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977); *Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984) (both cases involving parolees with known dangerous propensities).

Here, Ferree alleges four grounds for relief: (1) the defendants were negligent in allowing Ferguson to check out of the center on the evening of the murder in an intoxicated condition; (2) Ferguson was not given his daily antabuse medication on that day; (3) the defendants failed to review Ferguson's antabuse dosage after an earlier incident when he and another inmate became intoxicated to the point of unconsciousness; and (4) it was reckless or negligent to have granted Ferguson's request to attend a wedding, given his long history of alcohol abuse, without considering the availability of alcohol at the event.

■ Although proof of the allegations might establish lack of due care in the abstract on the part of the corrections officials, there is nothing to indicate that the officials were aware of anything more than a generalized possibility that Ferguson might cause difficulties because of his drug abuse. There was no reason to suspect that Ferguson was violent in general or would be violent toward a particular person or a particular type of person. Ferguson had no prior history of violence or of making threats, and corrections officials had no reason to know of any physical threat that Ferguson may have posed to the victim. Indeed, Ferguson and the victim were apparently unknown to each other. In short, officials had no duty of due care to the victim apart from their general duty to the public at large.

## III. SOVEREIGN IMMUNITY

Having decided that the defendants owed no duty of care toward the victim, we need not reach the questions raised by the doctrine of sovereign immunity. Some courts, including this Court, have addressed the liability of a corrections department solely as a question of sovereign immunity. *See, e.g., State v. Silva,* 86 Nev. 911, 478 P.2d 591 (1970). Sovereign immunity, however,

is an affirmative defense and conceptually arises subsequent to the question of whether there is tort liability in the first instance. There is sound reason and desirable simplicity in analyzing and applying negligence concepts before deciding issues of sovereign immunity. The California Supreme Court has stated:

> In sorting out the issues presented, it is important to consider first things first. Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity....
>
> ... As Professor Van Alstyne summarizes the problem in California Government Tort Liability Practice (Cont.Ed.Bar 1980) section 2.65: "Some cases represent an unnecessary effort to categorize the acts or omissions in question as immune discretionary functions, when the same result could be reached on the ground that the facts fail to show the existence of any duty owed to the plaintiff...."

*Davidson v. City of Westminster,* 32 Cal.3d 197, 201–02, 649 P.2d 894, 896, 185 Cal.Rptr. 252, 254 (1982).

The order of analysis suggested in *Davidson* in deciding a case that may involve sovereign immunity will avoid in some instances having to make difficult decisions with respect to the difficult discretionary exception doctrine in sovereign immunity cases. Deciding an immunity question first may lead to unwarranted assumptions and confusion about undecided duty problems. For these reasons, we decide this case on the issue of duty and forego addressing the issue of sovereign immunity.

## IV. CONCLUSION

Even viewing the facts in the light most favorable to the plaintiffs, we agree with the trial court's conclusion that no defendant had a duty of care toward the victim.

Affirmed.

HALL, C.J., and HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.