Richard D. MADSEN and Nancy Madsen, his wife, Boyd A. Swensen and Beatrice Swensen, his wife, Blaine Anderson and Sherree Anderson, his wife, Hope A. Hilton, Cynthia Hilton, Ralph M. Hilton, Gene Helland, the Middle East Foundation, Plaintiffs and Appellants,

v.

Mirvin D. BORTHICK, W. Smoot Birmhall and John Does I–V, being former Commissioners of the Utah Department of Financial Institutions, Defendants and Appellees.

No. 900262.

Supreme Court of Utah.

April 5, 1993.

Rehearing Denied April 23, 1993.

Robert J. DeBry, Edward T. Wells, Salt Lake City, for plaintiffs and appellants.

R. Paul Van Dam, Atty. Gen., Reed M. Stringham, Asst. Atty. Gen., Salt Lake City, for defendants and appellees.

STEWART, Justice:

Plaintiffs, depositors of the now defunct Grove Finance Company, sued Mirvin Borthick and W. Smoot Brimhall, former Commissioners of the Utah Department of Financial Institutions, in their personal capacities for gross negligence in carrying out their statutory duties in regulating and monitoring Grove Finance. The trial court entered summary judgment in favor of the Commissioners and dismissed plaintiffs' claims. We affirm.

This case comes before us on appeal for a third time. The protracted nature of this case calls for a review of the facts and procedural history leading up to this appeal.

In 1969, the Department of Financial Institutions (Department) licensed Grove Finance Company (Grove) as a supervised lender under the Utah Uniform Consumer Credit Code (UCCC). Utah Code Ann. §§ 70B–1–101 to –11–105 (1980).[1] As a su-

1. The events giving rise to plaintiffs' claims culminated in 1980. Unless otherwise noted, all references to the UCCC are to the 1980 edition of Utah Code Annotated. The UCC is currently codified at 70C–1–101 to –9–102.

pervised lender, Grove was authorized to make loans, but not to receive deposits. Sometime in the 1970s, Grove began selling debentures to the public. Although debentures are normally an investment security, the debentures sold by Grove were somewhat like deposit accounts in that the investors could deposit and withdraw varying amounts at irregular intervals.[2]

In response to a telephone complaint in March 1980, Borthick, then Commissioner of the Department, dispatched Gary Cox to examine Grove. Cox discovered that Grove's liabilities far exceeded its assets. Grove had $8 million in debentures and only $2 million in loans. Approximately one month later, Borthick issued a cease and desist order against Grove to stop selling debentures. Grove ignored the order, and on July 18, 1980, approximately three months after Cox's examination, Borthick closed Grove. Grove then filed chapter 11 bankruptcy. Plaintiffs and other depositors lost their money.

Plaintiffs sued the State of Utah and Borthick in his official capacity as Commissioner of the Department of Financial Institutions for failure to discharge their statutory duties. The trial court dismissed that action against both defendants for failure to state a claim upon which relief could be granted. This Court affirmed in *Madsen v. Borthick*, 658 P.2d 627 (Utah 1983) (*Madsen I*). We held that the State was immune from suit under the Governmental Immunity Act. We also held that the Governmental Immunity Act precluded Borthick from being sued in his official capacity as Commissioner. *See* Utah Code Ann. § 63–30–4 (1978). Although we indicated that Borthick could be sued in his individual capacity for gross negligence, fraud, or malice under Utah Code Ann. § 63–30–4, we affirmed the dismissal of plaintiffs'

complaint against Borthick because they had not alleged any of those causes of action.

Plaintiffs then commenced the instant action. They named as defendants Borthick and Brimhall in their individual capacities and alleged that the Commissioners had been grossly negligent in failing to comply with their statutory duties in licensing and supervising Grove. The district court entered summary judgment in favor of the Commissioners on three grounds: (1) *Madsen I* barred the action under the doctrine of res judicata; (2) the Commissioners were immune from suit under the 1983 amendments to the Governmental Immunity Act; and (3) the action was barred because the statute of limitations had run. We reversed and remanded for further proceedings on the ground that res judicata did not apply to bar the second action because the first suit did not end in a final judgment on the merits. *Madsen v. Borthick*, 769 P.2d 245 (Utah 1988) (*Madsen II*). We also held that although the 1983 amendments to the Governmental Immunity Act would preclude gross negligence claims against government officials in their individual capacities, the amendments could not be applied retroactively to afford immunity to defendants in this case. Finally, we held that because the first action had been timely commenced and had not been concluded on the merits, Utah Code Ann. § 78–12–40 tolled the statute for one year from the date of our decision in *Madsen I*.[3] Because plaintiffs had filed the second action within a year after *Madsen I*, their claims were not time-barred.

On remand from *Madsen II*, the trial court again dismissed plaintiffs' claims against the Commissioners. The claim against Borthick was dismissed on the ground that he owed no duty to plaintiffs

---

**2.** In view of the investment nature of debentures, plaintiffs are probably more accurately referred to as investors. Nevertheless, for the sake of discussion and because the debentures did resemble deposit accounts, we accept plaintiffs' self-characterization as "depositors."

**3.** Section 78–12–40 provides:
 If any action is commenced within due time and judgment thereon for the plaintiff is re-

versed, or if the plaintiff fails in such action or upon a cause of action otherwise than upon the merits, and the time limited either by law or contract for commencing the same shall have expired, the plaintiff, or if he dies and the cause of action survives, his representatives, may commence a new action within one year after the reversal or failure.

individually, that his duties and responsibilities were discretionary acts and therefore protected by the common law doctrine of good faith immunity, and that the complaint failed to state a claim against Borthick in his individual capacity as a matter of law. The claim against Brimhall was dismissed on the ground that it was barred by the statute of limitations. The trial court reasoned that because Brimhall had not been named in the first suit, § 78–12–40 did not operate to toll the statute of limitations as to the claim against him. Plaintiffs appeal from the orders of dismissal.

We first discuss whether the Commissioners owed a duty to plaintiffs individually. Plaintiffs claim that the trial court essentially adopted the "duty to all, duty to no one" doctrine in ruling that the Commissioners did not owe them a duty as individuals. That doctrine, plaintiffs argue, contradicts the Utah Governmental Immunity Act and our rulings in *Madsen I* and *II* that the Commissioners could be sued in their individual capacities for gross negligence in carrying out their official duties. Plaintiffs reason that requiring them to show that the Commissioners owed them a duty as individuals, in effect, creates immunity where none has been given.

Plaintiffs confuse the issues of tort liability with governmental immunity. The doctrine of governmental immunity provides that a governmental entity cannot be sued despite the existence of tort liability. *Weber v. Springville City*, 725 P.2d 1360, 1363 n. 5 (Utah 1986); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 131, at 1032 (5th ed. 1984). In the absence of governmental immunity, the basic elements of negligence must still be present to support a cause of action in negligence. *Weber*, 725 P.2d at 1363 n. 5; *State v. Superior Court of Maricopa County*, 123 Ariz. 324, 599 P.2d 777, 785 (1979); *see also Ferree v. State*, 784 P.2d 149, 152–53 (Utah 1989). In other words, plaintiffs must show that the Commissioners owed and breached a duty to them and that the breach of that duty proximately caused plaintiffs' injuries. *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985); *Superior Court of Maricopa County*, 599 P.2d at 785.

To hold a government agency or one of its agents liable for negligence or gross negligence, a plaintiff cannot recover for the breach of a duty owed to the general public, but must show that a duty is owed to him or her as an individual. *Ferree v. State*, 784 P.2d at 151; *see also C.T. v. Martinez*, 845 P.2d 246, 247 (Utah 1992); *Christenson v. Hayward*, 694 P.2d 612 (Utah 1984); *Obray v. Malmberg*, 26 Utah 2d 17, 19, 484 P.2d 160, 162 (1971). Plaintiffs argue that this rule does not apply here because they are suing the Commissioners in their individual, not official, capacities. Plaintiffs' claim of gross negligence, however, arises out of acts committed by the Commissioners in their official capacities. Seeking to hold the Commissioners personally liable for their official acts does not change the nature of the duties or relationships involved. Thus, for plaintiffs' claim to survive, they must establish the existence of a special relationship that imposes a duty of care on the Commissioners for the benefit of plaintiffs as individuals. *Beach v. University of Utah*, 726 P.2d 413, 415–16 (Utah 1986). In establishing the existence of a duty, the same analysis is used for both a negligence and a gross negligence claim. The difference between the two lies in the degree of care to which the defendant is held. *Prosser and Keeton on the Law of Torts* § 34, at 211–12.

Plaintiffs argue that Title 7 of the Utah Code, which governs the regulation of banking institutions, creates a special relationship between them and the Commissioners that gives rise to a duty not to act with gross negligence. Even though Grove was not licensed as a bank, plaintiffs assert that it functioned as one because it accepted deposits by selling debentures. Utah Code Ann. § 7–3–3 (1971 & Supp.1980)[4] defined the term "banking business":

---

**4.** Unless otherwise noted, all references to Title 7 are to the 1971 edition and the 1980 supplement of Utah Code Annotated.

Any corporation holding itself out to the public as receiving money in deposit whether evidenced by a certificate, promissory note or otherwise, shall be considered as doing a banking business and shall be subject to the provisions of this chapter as to such business.

Plaintiffs argue from this provision that Title 7 governed the Commissioners' responsibilities with respect to Grove and required the Commissioners to make annual examinations of Grove as if it were a licensed banking business, *see* § 7–1–8,[5] and that the Commissioners' failure to make annual examinations breached the statutory duty owed them, resulting in the loss of their investments.

The premise of plaintiffs' contention is fundamentally flawed. An entity that conducts an unauthorized or unlicensed banking business does not by virtue of that illegal conduct become a bank. Thus, even if the statutory provisions regulating licensed banking businesses create a special relationship from which a duty of care arises, those duties do not apply here because Grove was not a bank, but was instead conducting an unauthorized banking business.

Given that conclusion, the question is what duties the Commissioners had with respect to a business unlawfully operating as a bank. The provisions of Title 7 in effect at the time of Grove's alleged misconduct do not provide a definitive answer. Section 7–3–57 made it a misdemeanor for an unlicensed person or business entity to use the word "bank" or a similar name in its operations,[6] and the Commissioner's only statutory duty with respect to such a violation was to refer the matter to the appropriate county attorney. § 7–1–23.[7]

Grove has not been accused of using the word "bank" or any other similar name in its business practices in violation of § 7–3–57, but plaintiffs do allege that Grove conducted an unauthorized banking business. Title 7 currently provides criminal penalties for conducting an illegal banking business, § 7–1–701 (1988),[8] but no such provision existed at the time Grove was in business.

---

**5.** Utah Code Ann. § 7–1–8 provides:

The bank commissioner, or an examiner, shall visit and examine every bank, savings bank, every loan and trust corporation, every building and loan association, every industrial loan company, every small loan business, and every co-operative bank, at least once in a year.

**6.** Section 7–3–57 states:

No person, firm, corporation or association, other than a bank, national bank or trust company, shall make use of any office sign in the place where the business of such person, firm, corporation or association is transacted having thereon any artificial or corporate name or other words indicating that such place or office is the place or office of a bank or trust company, or that deposits are received therein, or that payments are made on check, or that any other form of banking or trust company business is transacted; nor shall such person, firm, corporation or association make use of or circulate any letterheads, billheads, blank notes, blank receipts, certificates or circulars, or any printed or written, or partly printed and partly written, paper whatever having thereon any artificial or corporate name or other word or words indicating that such business is the business of a bank or trust company; nor shall such person, firm, corporation or association transact business under any name which contains any of the words, "bank," "bankers," "banking,"

"savings bank," "savings," "trust," "trustee," or "trust company." Every person, firm, corporation or association, and every officer of a corporation or association, violating the provisions of this section shall be guilty of a misdemeanor.

**7.** Section 7–1–23 provides:

It shall be the duty of the bank commissioner to inform the county attorney of the county in which the bank or other institution is located of any violation of any of the provisions of law which constitutes a misdemeanor or felony by any officer, director or employee of any institution under the supervision of the banking department which shall come to his notice, and upon receipt of such information the county attorney shall institute proceedings to enforce the provisions of law.

**8.** Section 7–1–701 provides:

(1) It is unlawful for any person not authorized to conduct a business subject to the jurisdiction of this department to use a name, sign, advertisement, letterhead, or other printed matter which represents *or in any other manner to represent to the public that that person or the place of business of that person is a financial institution or is conducting a business which is subject to the jurisdiction of the department.*

....

(9) Every person, corporation, association, or other business entity and every officer of a

On discovering that Grove was engaged in transactions that could be construed as a banking operation, Borthick took steps to stop it from doing so. He issued a cease and desist order, and when that was ignored, Borthick closed Grove. We find no statutory provision in Title 7 that even arguably imposed any other duty on the Commissioner. In halting Grove's practices, Borthick did the only thing that could have been done under the circumstances. In fact, it is not even clear that the Commissioner had the statutory power to close Grove at that time. In short, even if Title 7 did create a special relationship between plaintiffs and the Commissioner, there was nothing in the title that imposed a duty on the Commissioner to do more than was done.

Plaintiffs argue alternatively that the UCCC imposes a duty on the Commissioner to periodically examine supervised lenders. Plaintiffs allege that the Commissioners never examined Grove in the eleven years from Grove's licensure in 1969 to its closure in 1980 and that this failure constituted a breach of a statutory duty owed them as individuals, resulting in the loss of their money.

One of the underlying purposes of the UCCC is to protect "consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors." § 70B–1–102(2)(d). To this end, the UCCC provides for the licensing and regulation of supervised lenders. §§ 70B–3–501 to –514.

A supervised lender is "a person authorized to make or take assignments of supervised loans." § 70B–3–501(4). A supervised loan is "a regulated loan in which the rate of the loan finance charge exceeds 18 per cent per year as determined according to the provision on loan finance charge for consumer loans." § 70B–3–501(3). A person may not make supervised loans unless licensed to do so. § 70B–3–502. Be-

fore licensing a person as a supervised lender, the Commissioner is required to investigate the applicant's financial responsibility, character and fitness to ensure that the business will be operated honestly and fairly within the purposes of the UCCC. § 70B–3–503. The UCCC places a number of restrictions on the terms of supervised loans, including a statutorily regulated finance charge. § 70B–3–508. The UCCC prohibits a supervised lender from contracting for an interest in land as security when the principal of the supervised loan does not exceed $1,000. § 70B–3–510. To ensure that a supervised lender complies with the provisions of the UCCC, § 70B–3–506 requires the Commissioner to make periodic examinations. Section 70B–3–506(1) states:

> The administrator shall examine periodically at intervals he deems appropriate the loans, business, and records of every licensee. In addition, for the purpose of discovering violations of this act or securing information lawfully required, the administrator or the official or agency to whose supervision the organization is subject (section 70B–6–105) may at any time investigate the loans, business, and records of any regulated lender.

These provisions are designed to protect a particular class of persons, i.e., consumer buyers, lessees, and borrowers of credit from the unfair credit practices of unscrupulous supervised lenders. We do not need to decide, however, whether this is sufficient to create a special relationship between the Commissioners and consumer debtors of supervised lenders, because even if it does, the Commissioners did not breach a duty owed to these plaintiffs. By their own admission, plaintiffs were not consumer debtors; they were depositors. The purpose of periodic examinations of supervised lenders is to discover violations of the UCCC, not to discover fraudulent securities transactions. Even if the Commissioners had periodically examined Grove, their examinations would have been

corporation or association violating the provisions of this section is guilty of a class A misdemeanor, and each day of violation shall constitute a separate offense.

(Emphasis added.)

directed toward ensuring compliance with the UCCC, not with determining whether Grove was accepting deposits by selling debentures. The regulation of supervised lenders is intended to protect a class of persons of which plaintiffs are not members from a harm not suffered by plaintiffs.

In short, Borthick and Brimhall owed no duty to plaintiffs as individuals. Because that issue is dispositive, we do not reach the plaintiffs' remaining issues.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.