**GLENCORE, LTD., fka Clarendon, Ltd., Plaintiff and Appellant,**

v.

**Paul R. INCE and Callister, Duncan & Nebeker, a professional corporation, Defendants and Appellees.**

No. 970113.

Supreme Court of Utah.

May 12, 1998.

---

M. David Eckersley, Salt Lake City, for plaintiff.

Stephen G. Morgan, Cynthia K.C. Meyer, Salt Lake City, for defendants.

ZIMMERMAN, Justice:

Glencore, Ltd., f.k.a. Clarendon, Ltd. ("Clarendon"), appeals from a trial court grant of summary judgment against it and in favor of attorney Paul R. Ince and his former law firm, Callister, Duncan & Nebeker ("CD & N"), now known as Callister, Nebeker & McCullough. Clarendon sued Ince and CD & N for legal malpractice to recover damages allegedly incurred during their representation of Clarendon in a bankruptcy preference action brought by CF & I Steel ("CF & I"). The trial court in the malpractice action granted summary judgment to Ince and CD & N, ruling that because the result in the preference action would not have been favorable to Clarendon even absent Ince and CD & N's alleged malpractice, Clarendon could not recover damages. We reverse.

We begin with a review of the rather complex facts and procedural history underlying this case before turning to the standard of review and our analysis. Ince and CD & N represented Clarendon, one of CF & I's

creditors, in a bankruptcy preference action brought by CF & I in which it sought to recover $450,725.83 in payments it made to Clarendon during the 90 days immediately preceding CF & I's voluntary bankruptcy. CF & I claimed the payments were voidable preferences under title 11, section 547 of the United States Code. During the course of that preference action, CF & I moved for summary judgment. Clarendon opposed the motion. Clarendon conceded that the payments in question were preferences but argued that they were not voidable because they fit an exception in the preference statute that allows a creditor to retain payments made during the 90–day preference period if the debtor made those payments "in the ordinary course of business." 11 U.S.C. § 547(c)(2). The payments at issue in the preference action consisted of three checks totaling $450,725.83: (i) check number 1505, in the amount of $175,239.38, paying an invoice 41 days old; (ii) check number 2227, in the amount of $197,105.42, paying invoices 45 to 49 days old; and (iii) check number 1130, in the amount of $78,381.13, paying invoices 52 to 59 days old.

The bankruptcy judge ruled that Clarendon failed to prove that any of the three payments met the section 547(c)(2) "ordinary course of business" exception because Clarendon failed to present evidence of industry standard practice as to the timing of payments. Thus, the bankruptcy judge concluded that all three payments were voidable preferences and entered judgment for $450,-725.83 against Clarendon.

Clarendon moved to set aside this judgment, arguing that its lawyer, Ince, failed to provide the industry standard evidence as a result of "excusable neglect" and asking to be relieved of that default.

On the day of the hearing, however, CF & I and Clarendon settled the claim, with Clarendon agreeing to pay $290,000 to CF & I. Clarendon then filed this malpractice action in state court against Ince and CD & N, seeking to recover the $290,000 it paid to CF & I and alleging this payment resulted from Ince's failure to provide the industry standard evidence.

In the malpractice action, Ince and CD & N moved for summary judgment on the basis of stipulated facts. Although Ince and CD & N admitted Ince's negligence for purposes of the motion, they argued they were entitled to judgment as a matter of law because Clarendon had suffered no damages. They reasoned that the $290,000 settlement Clarendon paid to CF & I was approximately equal to the amount Clarendon would have owed CF & I in the preference action even if Ince had provided the industry standard evidence. In essence, the trial court agreed with Ince and CD & N and granted summary judgment in their favor. We now review that decision.

■ "Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *K & T, Inc. v. Koroulis*, 888 P.2d 623, 626–27 (Utah 1994) (citing Utah R. Civ. P. 56(c); *Higgins v. Salt Lake County*, 855 P.2d 231, 235 (Utah 1993)). "Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented." *Id.* at 627 (citing *Higgins*, 855 P.2d at 235; *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989)). " 'We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact.' " *Id.* (quoting *Ferree*, 784 P.2d at 151).

■ Moving to our analysis, to prevail in a legal malpractice action, Clarendon must prove five elements: "(i) an attorney-client relationship; (ii) a duty of the attorney to the client arising from their relationship; (iii) a breach of that duty; (iv) a causal connection between the breach of duty and the resulting injury to the client; and (v) actual damages." *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996). For purposes of the summary judgment motion, Ince and CD & N conceded the first three elements and argued only that their breach was not the proximate cause of any damages to Clarendon.

■ To prevail on appeal, Clarendon must demonstrate that had Ince provided the industry standard evidence it should have pre-

vailed in the bankruptcy action. *See id.* A malpractice action, thus, necessarily presents "a case within a case." *See id.* at 440. " 'The objective is to establish what the result [of the underlying litigation] *should have* been (an objective standard), not what a particular judge or jury *would have* decided (a subjective standard).' " *Id.* (emphasis and alteration in original) (quoting 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 27.7 at 641–42 (3d ed.1989)).

In this case, the question of what should have been the result if Ince had timely presented the industry standard evidence turns on federal bankruptcy law. We therefore briefly explain the pertinent statutory law before we review the interpretations and applications of that law by the federal bankruptcy court and the state district court.

■ Under federal bankruptcy law, a "preference" is a payment made by a debtor to a creditor under the following circumstances: (i) the payment is made for a past debt; (ii) the debtor is insolvent at the time or files for bankruptcy within ninety days of the payment; and (iii) the amount of the payment is more than the creditor would have received under a chapter 7 liquidation. *See* 11 U.S.C. § 547(b). A payment that meets these requirements is "avoidable," meaning that the creditor must return the payment to the debtor's bankruptcy estate, unless the payment meets one of several exceptions. One of these is that the payment was made "in the ordinary course of business." *Id.* § 547(c)(2). To qualify for the "ordinary course of business" exception under section 547(c)(2), a payment (or "transfer") must be "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the

debtor and the transferee; and (C) made according to ordinary business terms[.]" *Id.*

Clarendon and CF & I agreed that the payments met the requirement of subpart (A): CF & I made the payments for debts incurred in the ordinary course of CF & I's business. However, Clarendon also had to prove the payments met the other two requirements found in subparts (B) and (C) of section 547(c)(2). Subpart (B) required Clarendon to show that CF & I made the payments to Clarendon in the ordinary course of business between CF & I and Clarendon.

To do this, Clarendon, through its attorney Ince, had to provide the court with evidence of the prior practice between Clarendon and CF & I as to the late payment of invoices. Subpart (C) required Clarendon to prove that CF & I made its payments according to ordinary business terms in the steel industry. To do this, Clarendon had to provide evidence of the industry standard for late payment of invoices in the steel business. *See generally In re Roblin Indus., Inc.*, 78 F.3d 30, 40–41 (2d Cir.1996). Thus, to prevail on its malpractice claim, Clarendon must prove that if Ince had presented the industry standard evidence, it should have prevailed in the bankruptcy court on both these elements. We address both of these elements in turn.

We begin with the subpart (B) requirement whether the payment was "made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B). The trial court in the malpractice action ruled that the federal bankruptcy court's conclusion under section 547(c)(2)(B), as to whether the three payments were made in the ordinary course of business between CF & I and Clarendon, was sound, and, therefore, it did not "disturb" the bankruptcy court's rulings.[1] Be-

---

**1.** The Utah trial court simply adopted the bankruptcy court's ruling that check 1130 did not meet subpart (B)'s "ordinary course of business" requirement and that Ince was therefore not liable for a breach as to check 1130. Because Ince conceded that Clarendon would have probably prevailed as to check 1505, neither the parties nor the court addressed whether it was a voidable preference. The trial court did not address check 2227 in connection with subpart (B). Apparently, the trial court presumed that check

2227 met subpart (B)'s ordinary course requirement because the court proceeded to analyze it under subpart (C). The trial court stated, "Whether Clarendon suffered damages proximately caused by defendants' breach of duty as to check number 2227 depends upon the application of element (C), whether the transfer was made according to 'ordinary business terms.' " A court would have no reason to analyze a check under subpart (C) unless the check met subpart (B)'s requirements. Thus, the district court's

cause the test for whether one has a valid malpractice claim depends on an objective test as to what should have happened in the first action absent malpractice, rather than what *would* have happened, we must review the bankruptcy court's analysis under subpart (B) to determine whether it was correct. If not, then both its determinations and that of the trial court must be reviewed to determine how the matter should have come out.

■ The bankruptcy court first applied section 547(c)(2)(B) to each of the three checks to determine if Clarendon made the payments within the parties' "ordinary course of business." The "ordinary course of business" element of the section 547(c)(2) exception looks at the dealings between the particular creditor and the particular debtor. The federal bankruptcy court defined "ordinary course of business" as requiring that any payment be made no later than the average lag time for all payments between the parties. Ince presented evidence that the average lag time between Clarendon's sending an invoice and CF & I's paying was 43.6 days. Using this 43.6 day average, the bankruptcy court held that (i) check 1505, paying an invoice 41 days old, was within the parties' ordinary course of business; (ii) check 1130, paying invoices 52 to 59 days old, was outside the parties' ordinary course of business; and (iii) a fact question existed as to whether check 2227, paying invoices 45 to 49 days old, was within the parties' ordinary course of business.

Clarendon argues on appeal that in adopting the bankruptcy court's ruling, the trial court erred. Ince and CD & N counter that the trial court properly gave issue-preclusive effect to the bankruptcy court ruling. We agree with Clarendon that the trial court erred, whether it gave the bankruptcy court ruling preclusive effect, or whether the trial court, itself, addressed the federal law.

■ Application of the doctrine of issue preclusion requires that (i) the issue in the case at hand is identical to the issue decided in the previous action; (ii) the issue in the

previous action was decided in a final judgment on the merits; (iii) the issue in the previous action was competently, fully, and fairly litigated; and (iv) the opposing party in the action at hand was either a party or privy with a party in the previous action. *See Stevensen v. Goodson*, 924 P.2d 339, 353 (Utah 1996) (relying on *Sevy v. Security Title Co.*, 902 P.2d 629, 632 (Utah 1995)). Here, the record before the trial court, and before us on appeal, does not establish the four elements necessary for issue preclusion.

As we noted in *Stevenson*, unless "'the record of the prior action was ... before the trial court, there is no basis to sustain the determination that plaintiff's claim was barred by the doctrine of res judicata.'" *Id.* (quoting *Parrish v. Layton City Corp.*, 542 P.2d 1086, 1087 (Utah 1975)). In *Stevensen*, we held that defendants' issue preclusion arguments failed because they had not provided the trial court a complete record of the prior adjudication upon which they based their claim of issue preclusion. *See id.* Here, although some portion of the federal bankruptcy record was before the trial court as addenda to Ince and CD & N's motion for summary judgment, nothing in that portion of the record establishes that the bankruptcy court's ruling became final. To the contrary, the unsigned copy of the settlement agreement included in the trial court record indicates that the parties contemplated that the bankruptcy court's order granting summary judgment to CF & I was a "non-final order." Because the "final judgment" element of the issue preclusion test is not met, and there is no independent basis for upholding the trial court's ruling, we vacate the trial court's holding simply adopting the bankruptcy court's conclusions as to subpart (B).

But even if the trial court adopted the bankruptcy court's analysis under section 547(c)(2)(B), rather than simply feeling bound by its ruling, it erred. The bankruptcy court, relying on *In re Classic Drywall, Inc.*, 121 B.R. 69 (D.Kan.1990), stated that it had to "compare[ ] and contrast[ ] the timing, amount, manner and circumstances of the

analysis only concerned whether checks 1130 and 2227 met subpart (C)'s "ordinary business

terms" requirement.

transaction against the backdrop of the parties traditional dealings." From this, the bankruptcy court concluded that "[t]he applicable test, then, looks at the ordinary course of business or, financial affairs between CF & I and Clarendon." The bankruptcy court's application of this test turned simply on a comparison of the actual number of days between an invoice and late payment and the average number of days between an invoice and late payment.

■ In the year preceding the 90–day preference period, CF & I made 20 payments to Clarendon ranging from 30 to 64 days after invoice. Based on these dates, the bankruptcy court found the average time between invoice and payment for CF & I and Clarendon was 43.6 days and ruled that payments made after the 43.6 day average were not within the parties' ordinary course. We disagree with the bankruptcy court that under federal law, any payments made later than the 43.6 day average were not within the parties' ordinary course of business.

■ The "ordinary course of business" exception is intended to "encourage[ ] continuation of normal financing relations between unsecured creditors and the debtor" to determine if a creditor made a payment according to the parties' ordinary business terms. *In re Julien Co.*, 157 B.R. 834, 847 (Bankr. W.D.Tenn.1993). Allowing creditors to retain preference payments made in the ordinary course of business encourages creditors to continue "normal financing relations" with debtors who are on the verge of bankruptcy. Without such an exception, a creditor who senses that a customer may be nearing bankruptcy would be reluctant to extend even ordinary credit, perhaps precipitating a slide into bankruptcy that might otherwise be avoided. Thus, the "ordinary course of business" exception allows a creditor to continue to extend credit to a shaky customer, secure in the knowledge that any payments received will not become avoidable preferences so long as the creditor's dealings with the debtor are within the range of "ordinary" compared to the past dealings.

To adopt, as the bankruptcy court did, a mechanical test that treats as avoidable any payment made after the mathematical aver-age of the number of days elapsing between invoice and payment over each past period would not further the stated objectives of the exception. Indeed, the bankruptcy court's ruling runs counter to those objectives. A creditor accepting a late payment has no way of knowing with certainty what the magic average will be because the creditor cannot know the relevant pre-preference time period until the debtor declares bankruptcy. Indeed, an average number has no real relationship to the ordinary dealings between the parties. Therefore, we think the better rule is to look at the range of transactions between the parties as indicative of their "ordinary course of dealings." This allows a creditor to determine the prior course of dealings and to continue to extend credit consistent with these dealings without risking having to return a payment if the customer later slides into bankruptcy.

This approach, moreover, also better comports with the law as described by the *Classic Drywall* court. As that court explained, "What is subjectively ordinary between the parties is answered from comparing and contrasting the timing, amount, manner, and circumstances of the transaction against the backdrop of the parties' traditional dealings.... The transaction is scrutinized for anything unusual or different." 121 B.R. at 75. Using an average as determinative of the parties' ordinary dealings fails to consider adequately the "backdrop" of traditional dealings and considerably narrows what a court could conclude was not "unusual or different."

■ Having set forth the test we think would have *objectively* been correct, the test the bankruptcy court should have used, under section 547(c)(2), we apply it to the three checks. Check 1130, paying invoices 52 to 59 days old, was within the ordinary course of business between Clarendon and CF & I because Clarendon had, in the pre-preference period, accepted payments as late as 64 days after invoice. For the same reason, check 2227, which paid invoices 45 to 49 days old, and check 1505, paying an invoice 41 days old, were also within the parties' ordinary

course of dealings in the pre-preference period.

Having determined that all three payments met the requirement of section 547(c)(2)(B), next we must determine if CF & I made the payments according to the ordinary business terms of the steel industry as required by section 547(c)(2)(C). The bankruptcy court ruled that Ince's failure to provide industry standard evidence meant that Clarendon had failed to prove that CF & I made any of the three payments according to the ordinary business terms in the steel industry. The district court considered the evidence Ince failed to present to the bankruptcy court and ruled that neither check 1130 nor check 2227 met subpart (C)'s requirements and that both, therefore, were voidable preferences. This meant that no damages had been suffered by reason of Ince's malpractice.

■ We now apply subpart (C) to determine for ourselves whether under an objective standard a bankruptcy court should have found that CF & I had made the three payments according to the ordinary business terms of the steel industry. The evidence presented to the trial court—the evidence that Ince should have but did not present to the bankruptcy court—established that the average lag time between invoice and payment in the steel industry was 40 to 45 days, or 42.5 days. The evidence also established that the average lag time was 31 to 33 days for the top quarter of the industry, 42 to 43 days for the middle quarter of the industry, and 48 to 51 days for the bottom quarter. The trial court reasoned that because checks 1130 and 2227 paid invoices that were more than 42.5 days old, the industry average, they were not paid according to "ordinary business terms" in the steel industry and should not have survived the preference action. What the bankruptcy law is is a legal question, which we review for correctness. See State v. Pena, 869 P.2d 932, 936 (Utah 1994). We review by this same standard the legal consequences of uncontested facts. See id. at 936–37.

■ We conclude that both check 2227 and check 1130 were paid according to "ordinary business terms" as that clause is used in the federal statute. We base this conclusion on the persuasive reasoning of Judge Posner in the case of In re Tolona Pizza Prod. Corp., 3 F.3d 1029 (7th Cir.1993). Judge Posner explains that the "ordinary business terms" language in section 547(c)(2)(C) serves the function of "allay[ing] the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy" by creating a course of dealings that is outside the range of that used in the industry. 3 F.3d at 1032. While subpart (C)'s "ordinary business terms" provision is designed to ensure some objective check or review of the "ordinary course of business of the debtor and the transferee" in subpart (B), subpart (C), like subpart (B), is also designed to encourage creditors to extend credit to shaky customers, secure in the knowledge that as long as no unorthodox arrangements are made, the creditor will be allowed to keep the payments. Thus, Judge Posner concludes, and we agree, that "ordinary business terms" is not to be measured by the average number of days the industry takes to pay invoices as the trial court concluded. Rather, it should be measured by "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary." Id. at 1033.

■ For reasons similar to those that Posner gives for expansively reading the "ordinary business terms" limitations, we agree with the Fourth Circuit in Advo–System, Inc. v. Maxway Corp., 37 F.3d 1044 (4th Cir. 1994), that the length of the course of dealings between the parties lessens the importance of the "ordinary business terms" requirement. That court reasoned that "when the parties have an established relationship, the terms previously used by the parties in the course of dealings are available as a baseline. The industry norm, though still relevant, becomes less significant." Id. at 1044. Such a rule prevents creditors with a long established history of extending credit to a debtor that may be at variance with industry standards from having to abandon this practice for fear of losing such payments

in a preference action. A more narrow interpretation of this rule, requiring strict conformance with the industry standard, would force creditors to restrict the availability of credit to debtors, thereby hastening the debtors' slide into bankruptcy. Allowing credit arrangements that are within the parties' historical practices and not widely variant from the range of industry practices to come within the "ordinary course of business" exception protects creditors' settled expectations and assists debtors in obtaining supplies necessary to keep their businesses viable.

Given these considerations, we find that the trial court erred when it ruled that check 2227 was not in accordance with "ordinary business terms." The range of practices for payment of invoices in the steel industry was 31 to 51 days after invoice. Check 2227 paid invoices from 45 to 49 days old. Clearly this was well within the industry practice. Further, check 1130, which paid invoices 52 to 59 days old, was not so far outside the industry standard as to be outside the exception. This is especially so given the parties' eight-year history and their pre-preference practice of payment up to 64 days after invoice. Thus, we conclude that check 1130, check 2227, and check 1505 should have survived the preference action brought by CF & I against Clarendon. Therefore, Clarendon suffered damages of $290,000 when it settled the preference action with CF & I.

Because Clarendon should have prevailed in the preference action brought by CF & I in the absence of Ince's negligence, Ince and CD & N's motion for summary judgment fails because Clarendon has suffered damages. Therefore, we remand to the trial court for further proceedings consistent with this opinion.

Reversed.

DURHAM, Associate C.J., and STEWART and RUSSON, JJ., concur in Justice ZIMMERMAN'S opinion.

HOWE, C.J., dissents.