**AIG AVIATION INSURANCE SERVICES, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. No. 94–NC–3B.

United States District Court, D. Utah, Northern Division.

Feb. 9, 1995.

H. Wayne Wadsworth, Ballard, Spahr, Andrews & Ingersoll, Craig C. Coburn, Richards, Brandt, Miller & Nelson, Hardin A. Whitney, Salt Lake City, UT, for defendant and third-party plaintiff Morrison Maierle/CSSA.

Thomas K. Pfister, Torts Branch, Civ. Div., U.S. Dept. of Justice, Viola M. Pando, Office of the Chief Counsel, F.A.A., Washington, DC, Scott M. Matheson, Jr., U.S. Atty., Daniel D. Price, Asst. U.S. Atty., Salt Lake City, UT, for defendant U.S.

Douglas J. Pahl, Kern and Wooley, Los Angeles, CA.

Roger H. Bullock, Strong & Hanni, Salt Lake City, UT.

Gregory B. Monson, Stoel Rives Boley Jones & Grey, Stephen B. Nebeker, Ray Quinney & Nebeker, Thomas L. Kay, Snell & Wilmer, Craig R. Mariger, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT, for all other defendants.

### OPINION AND ORDER

BENSON, District Judge.

#### I.  Introduction

Pending before the Court are two motions: 1) Defendant United States of America's Motion to Dismiss Claims in Plaintiffs' Second Amended Complaint in Lieu of Answer;[1] and 2) Defendant Brigham City Corporation's Motion for Summary Judgment. Counsel for the parties appeared for oral argument on the motions on January 13, 1995, counsel for the United States participating by telephone. The Court heard oral argument and took both motions under advisement.

Now being fully apprised and for good cause appearing, the Court hereby enters the following Opinion and Order granting both motions.

#### II.  Factual Background[2]

On January 24, 1993, plaintiff South Coast Helicopters, Inc. was flying a Bell helicopter from Rock Springs, Wyoming, to Enterprise, Oregon. The helicopter stopped at the Brigham City, Utah, airport for fueling. The airport manager, Bruce Leonard, advised the pilot, Bruce Benson, that the airport no longer had a public fuel dispensing facility. He directed Mr. Benson to a private corporate operator, Flying J, Inc., that might be able to sell him some fuel. Flying J's chief pilot, Pat Reardon, confirmed to Mr. Benson that he could sell him some fuel and told Mr. Benson to position his helicopter at the south end of the Flying J hangar.

Mr. Benson proceeded to fly the helicopter from the ramp area where he had landed to the Flying J hangar, some 400 feet from the ramp. While flying the helicopter along the taxiway to the Flying J hangar, the helicopter struck two unmarked power lines suspended approximately 30 feet above the taxiway. The helicopter crashed and was a total loss, less salvage.

South Coast and its insurer, AIG Aviation Insurance Services, Inc., filed this action in

---

1. This motion supersedes the government's earlier motion to dismiss, directed at plaintiffs' original complaint, which came before the Court for oral argument on May 20, 1994. According to plaintiffs' counsel, discovery in this case disclosed facts significantly distinct from those originally alleged to merit amending the complaint. The government's new motion followed.

2. For purposes of the government's motion to dismiss, the Court assumes, as it must, that the allegations set forth in plaintiffs' Second Amended Complaint are true. *Berkovitz v. United States*, 486 U.S. 531, 540, 108 S.Ct. 1954, 1961, 100 L.Ed.2d 531 (1988). For purposes of Brigham City's motion for summary judgment, the undisputed material facts are identified below in part III.B.

federal court seeking recovery from various defendants, including the two defendants involved in the instant motions. Plaintiffs' Second Amended Complaint alleges the United States, in the form of the Federal Aviation Administration ("FAA"), was negligent in specifying, approving, operating, maintaining, and inspecting the airport facilities, and in not requiring that the power lines in question be buried or marked. (*See* Second Am. Compl. ¶ 22.) Plaintiffs bring their action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 ("FTCA").

The Second Amended Complaint also alleges Brigham City Corporation negligently operated and maintained the airport by failing to mark or bury the lines. (*See* Second Am.Compl. ¶¶ 28–30.)

The United States argues that the FAA's actions fall within the discretionary function exception to the FTCA and that this Court consequently lacks jurisdiction to consider the case. Brigham City argues that its actions fall within the state discretionary function exception and that it therefore is entitled to judgment in its favor as a matter of law.

### III.  Discussion and Ruling
#### A.  The United States' Motion to Dismiss

The FTCA waives the federal government's sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The waiver is subject to a number of express exceptions. *See id.* § 2680.

One of these is the discretionary function exception. *Id.* § 2680(a). Under this exception, the waiver of immunity does not apply to "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.*

■ Once the government has invoked the exception, plaintiffs bear the burden of showing it does not apply to the case at hand. *Miller v. United States*, 710 F.2d 656, 662

(10th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983). To do so, plaintiffs must first point to a federal mandate that requires a certain course of conduct. If they can, and if their claims include the allegation that the government failed to comply with the specified course of conduct, the government may not claim the protection of the exception. If, on the other hand, the challenged action involved discretion vested in the agency and carried out pursuant to the policy of the applicable regulatory regime, the government may claim the benefit of the exception. *See Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988).

Plaintiffs have attempted to meet their burden by submitting a thorough brief with relevant documentation. The government has responded in kind. The Court will now examine the submissions of both sides.

#### 1.  Violation of a Federal Mandate

The discretionary function exception does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an [agency] to follow." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. Plaintiffs in the instant case point to two directives they claim required the FAA to address the hazard posed by the power lines.

First, plaintiffs argue the FAA violated FAA Airport Safety Data Program Order 5010.4. Second, plaintiffs argue the FAA violated FAA Advisory Circular 150/5300–13 § 403(a)(4).

##### a.  FAA Airport Safety Data Program Order 5010.4

■ The FAA Airport Safety Data Program implements the statutory authority of the FAA to collect and disseminate data to help assure safe air transportation. (*See* Order 5010.4, Plaintiffs' Mem. in Opp. Exh. D, at i.) The Order "sets forth requirements for the collection, maintenance, and dissemination of airport data through a physical inspection" of aircraft land facilities. *Id.* Paragraph 35 instructs FAA inspectors that, during inspections, they are to "[l]ook for and report all items on the airport that could be

hazardous, such as unmarked obstructions ... and other safety hazards on or near the runway." *Id.* at 13.

Plaintiffs have submitted five FAA Forms 5010–1, showing five FAA inspections at the Brigham City Airport, pursuant to Order 5010.4, between April 8, 1986, and January 24, 1993, the date of the accident. (*See* Plaintiffs' Mem. in Opp. Exh. F.) Plaintiffs point out that none of the reports mentions the power lines involved in the accident. They accordingly maintain that "[d]espite the specific mandates of FAA Order 5010.4, the FAA was negligent in its inspection of the Brigham City, Utah[,] Airport by failing to report the unmarked power lines which were extended over the marked taxiway on which the accident occurred." (Plaintiffs' Mem. in Opp. at 7.)

At the highest policy making level, the decision to implement the Airport Safety Data Program was a judgment call involving the most basic policy decisions. *Cf. United States v. Varig Airlines,* 467 U.S. 797, 819–20, 104 S.Ct. 2755, 2767, 81 L.Ed.2d 660 (1984) (FAA decision to implement airplane design spot-check program to assure compliance with regulations involved "discretionary regulatory authority of the most basic kind"). Congress authorized the FAA to collect, maintain, and disseminate safety data, but it left to the FAA how best to fulfill that obligation. *See* 49 U.S.C.App. §§ 1301–1542; Order 5010.4, at i. Any challenge to the program itself runs squarely into the discretionary function exception. *See Varig Airlines,* 467 U.S. at 819–20, 104 S.Ct. at 2767–68. In the instant case, however, plaintiffs have not challenged the program itself.

Once the program was in place and Order 5010.4 was promulgated, the order did impose a specific mandate on the FAA to regularly inspect the Brigham City Airport and file appropriate reports. *See* Order 5010.4, ¶ 26; *id.* ¶ 37. The FAA thereafter lacked discretion whether to collect and disseminate data from the airport. However, the FAA complied with those specific collection and reporting requirements, as evidenced by the inspection reports included as plaintiffs' exhibits.

Finally, as noted, Order 5010.4 instructed FAA inspectors to "look for and report all items on the airport that could be hazardous." *See* Order 5010.4, ¶ 35 ("Reporting Unsafe Conditions"). This directive is mandatory in only one sense: an FAA inspector has no discretion whether to conduct such an investigation during an inspection. The rest of the provision impliedly vests the inspector with discretion to determine which items "could be" hazardous.

There is no allegation in this case that the FAA inspectors failed to inspect the Brigham City Airport facilities. Plaintiffs' Second Amended Complaint and submissions in opposition to the government's motion have rather alleged the inspectors did so negligently, failing to list the power lines in question. That allegation focuses on the nonmandatory aspect of the provision: whether in the inspectors' judgment the power lines, situated as they were, "could be hazardous."

Whether the FAA inspectors should have included the power lines in their reports depended wholly on whether the inspectors viewed the lines as potentially hazardous. The inspectors could consider the location of the lines, their visibility, the purpose of the marked taxiway beneath them, the frequency with which the taxiway was used, and other similar considerations in making this determination. This aspect of the FAA inspections, then, involved "an element of judgment or choice." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958 (citing *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953)).

The fact the provision in question lists unmarked obstructions as one example of what to look for does not alter this conclusion. The directive does not say, "Look for and report all unmarked power lines over taxiways," or even, "Look for and report all unmarked obstructions." In either of those cases, failure to report the power lines would amount to a direct violation of a mandatory provision, and the discretionary function exception would not apply. Such mandates are distinct, however, from the language of the provision at issue, which merely lists examples of things to look for when conducting the inspection.

Reading the provision to compel an inspector to report *all* unmarked power lines not only does violence to the language of the provision, it ignores the fact that what could be dangerous under one set of circumstances might not be under another. This is especially true under the alleged facts of the instant case, where the taxiway in question was limited in its use. To hold that the provision required the FAA to report those particular power lines as potentially hazardous is tantamount to judicial second guessing.[3]

The FAA inspectors' exercise of judgment falls within the scope of the discretionary function exception, even if exercised wrongfully or in an objectively unreasonable manner. *Dalehite v. United States,* 346 U.S. 15, 33, 36, 73 S.Ct. 956, 967, 968, 97 L.Ed. 1427 (1953); *see also* 28 U.S.C. § 2680(a) (protecting discretionary acts even if government abuses its discretion). Congress intended to protect such decisions from judicial second guessing if they are based in policy. *See Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. at 1958–59 (citing *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)); *infra* part III.A.2. Accordingly, the inspectors' decision not to report the power lines in question—whether right or wrong, carefully or negligently made, deliberate or overlooked—is not the proper subject of a lawsuit in federal court, if that decision is grounded in the relevant policy scheme. *See infra* part III.A.2 (discussing policy considerations).

By completing the airport inspections and filing the appropriate inspection forms, the FAA complied with the requirements of FAA Order 5010.4. Whether to classify the power lines in question as unsafe and therefore worthy of reporting was a judgment call. Plaintiffs have consequently failed in their attempt to identify Order 5010.4 or any portion of it as a federal mandate with which the government failed to comply.

### b. *FAA Advisory Circular 150/5300–13*

■ Plaintiffs also allege the FAA violated FAA Advisory Circular 150/5300–13, dated

September 29, 1989. Section 403(a)(4) of that circular reads:

> a. *Design Standards.* The taxiway safety area shall be:
>
> . . . . .
>
> (4) free of objects, except for objects that need to be located in the taxiway safety area because of their function. These objects shall be constructed on low impact resistant supports (frangible mounted structures) of the lowest practical height with the frangible point no higher than 3 inches (7.6 cm) above grade.

Plaintiffs argue the FAA violated this requirement "by failing to report the obstructing power lines following the construction and marking of the taxiway" and "by failing to clear or require the clearance of the taxiway." (Plaintiffs' Mem. in Opp. at 8.)

Advisory Circular 150/5300–13 did not require the FAA to report, bury, or mark the power lines in question. The circular itself states its application:

> The standards and recommendations contained in this advisory circular are recommended by the Federal Aviation Administration for use in the design of civil airports. For airport projects receiving Federal grant-in-aid assistance, the use of these standards is mandatory.

AC 150/5300–13, ¶ 3. By its own terms, the circular describes requirements issued *by* the FAA for use in airport design, not *for* the FAA itself to perform. Plaintiffs have not cited to a provision in the circular that would require the FAA to inspect, report, mark, or clear any objects that violated the taxiway standard.

Even if they could, the circular still would not apply to the power lines involved in the crash. The circular merely specifies prospective standards "for use in the *design* of civil airports"; nothing in the cited portions requires the FAA to deal with objects such as the power lines that were already in place when the circular was promulgated Septem-

---

**3.** The practical result would be an FAA inspection in which inspectors list "Everything" as items that *could be* hazardous.

ber 29, 1989. Plaintiffs' Second Amended Complaint alleges that "[t]he taxiway to the Flying J hangar had been extended under the overhead power lines and marked with a yellow center line by April 8, 1986." (Second Am.Compl. ¶ 19.) Any challenge based on the language of the circular under the alleged facts is therefore misplaced.

Even if the circular did apply to the taxiway where the accident occurred, the circular did not require the FAA to do anything about the power lines. The cited provision prescribes requirements for the "taxiway safety area." The circular defines this term as "[a] defined surface alongside the taxiway prepared or suitable for reducing the risk of damage to an airplane unintentionally departing the taxiway." AC 150/5300–13 at 5. The standard therefore applies only to objects *alongside* the taxiway; it says nothing of objects suspended *above* the taxiway.

In short, Advisory Circular 150/5300–13 did not require the FAA to report, mark, or bury the power lines in question. Accordingly, plaintiffs have failed in their attempt to identify this advisory circular as a federal mandate with which the government did not comply.

### 2. Policy Considerations

The remaining question under the *Berkovitz* analysis is whether the FAA's alleged action or inaction in the instant case was grounded in the policy of the applicable regulatory regime. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991). "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the

policy of the regulatory regime." *Id.* at 324–25, 111 S.Ct. at 1274–75.

In the instant case, plaintiffs' Second Amended Complaint does not meet the burden described by the *Gaubert* Court. The discretion exercised by the FAA while inspecting and reporting potential hazards under Order 5010.4 was firmly grounded in the regulatory regime of the Airport Safety Data Program, which in turn implements federal statutory authority. The very purpose of that regime is to collect and disseminate data, which purpose the inspections and reports fulfilled. Plaintiffs allege nothing more than negligence on the part of the FAA inspectors in judging which items to report while carrying out their discretionary, policy-based regulatory duties. The discretionary function exception protects the United States from suits based on such allegations. *See Dalehite*, 346 U.S. at 36, 73 S.Ct. at 968 ("[A]cts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."); *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2768 ("[A]cts of FAA employees in executing the [discretionary] program in accordance with agency directives are protected by the discretionary function exception," despite plaintiffs' allegation of negligence in doing so).[4]

Furthermore, as already noted, Advisory Circular 150/5300–13 did not impose mandatory requirements on the FAA that altered its discretion regarding the power lines in question. The FAA's inaction with respect to the *already existing* power lines, which forms the basis of plaintiffs' Second Amended Complaint, was firmly grounded in the policy of FAA Advisory Circular 150/5300–13 to prescribe design standards for *new* airport facilities. "A decision ["whether explicit or implicit"] that is a component of an overall policy decision protected by the discretionary function exception also is protected by this

---

4. The alleged facts of the instant case are not unlike those post-*Varig* cases in which other federal inspectors have been found to be exercising discretion pursuant to an overall policy scheme. *See, e.g., Daniels v. United States*, 967 F.2d 1463 (10th Cir.1992) (OSHA inspector's discretion pol-

icy-based); *Redmon v. United States*, 934 F.2d 1151 (10th Cir.1991) (FAA inspector's discretion policy-based); *Russell v. United States*, 763 F.2d 786 (10th Cir.1985) (mine inspector's discretion policy-based) (following *Hylin v. United States*, 755 F.2d 551 (7th Cir.1985)).

exception." *Zumwalt v. United States,* 928 F.2d 951, 955 (10th Cir.1991).

### 3. Summary

■ Because neither of the directives identified by the plaintiffs required the FAA to mark, bury, or report the power lines in question, plaintiffs have failed to meet their burden under the first prong of the *Berkovitz* test. Because the decisions of the FAA inspectors were judgment calls based on the discretion vested in the agency by the relevant regulatory policy schemes, plaintiffs have failed to meet their burden under the second prong of the *Berkovitz* test, as modified by *Gaubert.* The United States is therefore entitled to dismissal in this case based on the discretionary function exception to the FTCA.[5]

### B. Brigham City Corp.'s Motion for Summary Judgment

Brigham City has also invoked a discretionary function exception in its motion, the state exception found in the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 *et seq.* That act reaffirms immunity for state governmental functions in general, but waives immunity for injury proximately caused by a negligent act or omission of a government employee acting within the scope of employment. *Id.* §§ 63–30–3, –10(1). However, like the FTCA, the act contains an exception to that waiver for discretionary functions. *Id.* § 63–30–10(1)(a).

In relation to the city's motion, the following material facts are undisputed by the parties (*see* Mem. in Supp. of Def. Brigham City's M/SJ at 3–5):

1. On January 24, 1993, a Bell 206 helicopter was damaged as a result of the crash occurring on the premises of the Brigham City Airport. (Second Am.Compl. ¶¶ 13–14.)

2. The accident occurred when the helicopter struck two overhead power lines while it was air taxiing. (*Id.* ¶ 13.)

3. Brigham City Corporation is the owner and operator of the Brigham City Airport. (Affidavit of E. Bruce Leonard ¶ 4.)

4. Defendant Brigham City Corporation is a municipal corporation subject to the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 *et seq.* (Second Am. Compl. ¶ 4; Leonard Aff. ¶ 2.)

5. Other than routine and general maintenance, all improvements to the airport are generally funded by way of grants from the Federal Aviation Administration in accordance with the Airport and Airway Improvement Act of 1982. (Leonard Aff. ¶ 3.)

6. If an improvement is not funded by the FAA the improvement must be approved by the City and the funds allocated in accordance with the city's budget. (Leonard Aff. ¶ 4; Deposition of Bruce Leonard at 138–42.)

7. The subject power lines were installed by Utah Power & Light at the request of the FAA in approximately 1983 pursuant to the Airport and Airway Improvement Act of 1982. (Leonard Aff. ¶ 5.)

8. Sometime after the installation of the overhead power lines and before this accident, Bruce Leonard inquired of Utah Power & Light what it would require to bury the subject power lines. He was informed that Utah Power & Light would charge Brigham City Corporation approximately $6,000 to bury the subject power lines. (*Id.* ¶ 6.)

9. The FAA never granted any funds to bury or to mark the subject power lines since there were more deserving projects at the airport, especially considering the location of the subject power lines. (*Id.* ¶¶ 7, 9.)

---

**5.** At oral argument, plaintiffs renewed several arguments they had raised in opposition to the government's initial motion to dismiss. To the extent those arguments are relevant to the twice-amended complaint, they likewise fail. None of the sections plaintiffs cited from the Airport and Airway Improvement Act of 1982 or the Code of Federal Regulations required the FAA to mark, bury, or report the power lines in question. Under the Act and applicable regulations, the FAA has broad policy-based discretion to improve airport safety. The decision not to address these particular power lines is a component of that overall discretion, regardless whether that decision was made carefully or negligently, explicitly or implicitly. *See Zumwalt,* 928 F.2d at 955. As succinctly stated in a similar context, "The FAA has a statutory duty to *promote* safety in air transportation, not to insure it." *Varig Airlines,* 467 U.S. at 821, 104 S.Ct. at 2768.

10. The city budget never included allocation of funds to bury or mark the subject power lines since there were other more deserving projects in the city, especially considering the location of the power lines. (*Id.* ¶¶ 8–9.)

Plaintiffs did not dispute these facts in their opposition memorandum. Rather, they identified additional facts, then argued those additional facts created material fact issues. (*See* Plaintiffs' Mem. in Opp. at 2–7.) However, plaintiffs' additional facts are immaterial to the issue of Brigham City's immunity, as more fully set forth below. The city's status under the statutory exception is a pure question of law that may be decided on the undisputed material facts identified above.

■ Plaintiffs raised the initial issue of whether Brigham City's operating the airport was a "governmental function" for purposes of the Utah Governmental Immunity Act. The statute itself answers that question:

> "Governmental function" means any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

Utah Code Ann. § 63–30–2(4)(a). Prior to the 1987 enactment of this subsection, the courts defined a governmental function more narrowly, distinguishing between functions only government could undertake and functions "proprietary" in nature that private entities could also perform. *See, e.g., Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1236–37 (Utah 1980); *Johnson v. Salt Lake City Corp.*, 629 P.2d 432, 434 (Utah 1981). The statute erases that distinction and provides a broad definition that easily encompasses the operation of an airport by a municipality.[6]

Accordingly, the city's operation of the airport falls within the Governmental Immunity Act. *See* Utah Code Ann. §§ 63–30–3 (act applies to governmental functions). In that act, as already noted, the Utah Legislature waived immunity for negligence by government employees, much as Congress did in the FTCA. *Id.* § 63–30–10(1). However, like the FTCA, the Utah act exempts from suit all acts or omissions of a government employee committed within the scope of employment if the injury "arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." *Id.* § 63–30–10(1)(a).

■ Despite the similarities in language between the state and federal discretionary function exceptions, the two provisions have been interpreted differently.[7] Utah courts

---

6. Despite the statutory definition, plaintiffs argued that a post-statute Utah Supreme Court case, *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 784 P.2d 459 (Utah 1989), continued to apply the pre-statute standard. Before it even considered the statutory language, the court in *Rocky Mountain Thrift Stores* determined that maintenance and operation of a city-wide storm drainage system was a governmental function. *Id.* at 462. The court therefore found it unnecessary to examine the provision. *Id.*

The court did note, however, that it would not apply new statutory provisions retroactively to the facts of the case, which occurred in 1983. *See id.* at 461 (citing Utah Code Ann. § 68–3–3 ("No part of these revised statutes is retroactive, unless expressly so declared.")). In the instant case, the helicopter crash occurred in 1993. The language of the 1987 statute therefore applies to the facts of the case and controls the interpretation of "governmental function." Plaintiffs have

given no reason why this Court should ignore that clear statutory language.

7. Language from a 1983 Utah Supreme Court case suggested the interpretation of the state act followed that of the federal act. *See Little v. Utah State Division of Family Services*, 667 P.2d 49, 51 (Utah 1983). However, the U.S. Supreme Court's 1984 *Varig Airlines* decision altered the course of the federal exception, substantially broadening its application and effectively eliminating the distinction between policy making and operational activities, a distinction that remains fundamental in the state inquiry. *Compare Varig Airlines*, 467 U.S. at 811–13, 820, 104 S.Ct. at 2763–64, 2768 (holding the nature of the conduct, rather than the level of implementation, controls the inquiry; holding further that employees at the operational level were immune from suit for policy-based discretionary decisions; and distinguishing *Indian Towing Co. v.*

have consistently employed a formula set forth in *Little v. Utah State Division of Family Services,* 667 P.2d 49, 51 (Utah 1983), to determine whether an act is discretionary within the meaning of the Utah exception. "To be purely discretionary, an act by the state must be affirmed under four preliminary questions:"

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

In *Duncan v. Union Pacific Railroad,* 842 P.2d 832 (1992), the Utah Supreme Court applied these criteria in holding that the Utah Department of Transportation was immune from suit for failing to install adequate warning devices at a railroad crossing. The *Duncan* court's analysis illustrates the application of the *Little* test:

First, a basic governmental objective is involved—the promotion of public safety at railroad crossings. Second, the evaluation of crossings and the assigning of priorities for upgrading the adequacy of warning devices now in place are essential to the improvement of public safety. Third, UDOT exercises "basic policy evaluation, judgment and expertise" in utilizing a surveillance team to weigh the degree of hazard at the crossings it inspects and to subsequently assign priorities to those

crossings where the greatest hazard exists. Fourth, UDOT has the necessary statutory authority to determine which crossings are most hazardous and most deserving of the limited funds available for active warning devices.

*Duncan,* 842 P.2d at 835.

In the instant case, the undisputed material facts and the uncontested affidavit of E. Bruce Leonard [8] first confirm that a basic governmental objective is involved—allocating limited resources to improve the condition of the city airport. According to Mr. Leonard, the decision not to do anything about the power lines was based on a balancing of fiscal restrictions against the perceived necessity of the problem posed by the power lines. (Undisputed Material Facts ¶¶ 5–6, 9–10; Leonard Aff. ¶¶ 2–4, 6–9.) Based on that undisputed fact, the first question in the *Little* test may be answered in the affirmative.

Second, the decision not to address the power lines was essential to the realization of the stated policy. Had the city acted otherwise, the policy of allocating resources for improvements on a perceived-need, priority basis would have been flouted.

Third, the city exercised basic policy evaluation, judgment, and expertise when it evaluated the power lines in question several years ago, received an estimate on the cost to bury them, and decided the cost outweighed the benefit at that time. (*See* Facts ¶¶ 8–10; Leonard Aff. ¶¶ 6–9.) That judgment call was based in part on the fact that no aircraft at the airport were put in danger by the power lines in the location they were, over a taxiway used for a limited purpose. (*See* Leonard Aff. ¶ 9.)

Fourth, Brigham City had the necessary lawful authority to make the determination. In fact, plaintiffs contend Brigham City's negligence lay in its failure to exercise that authority to adequately protect plaintiffs.

---

*United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), which enunciated the discretionary/operational distinction), with *Little,* 667 P.2d at 51 (following *Indian Towing Co.); see also Duncan v. Union Pacific R.R.,* 842 P.2d 832, 835 (Utah 1992) (continuing to recognize and apply the discretionary/operational distinction).

**8.** Mr. Leonard is Director of Public Works for Brigham City, a position that includes responsibility for the operation, development, and improvement of the Brigham City Airport. (*See* Affidavit of E. Bruce Leonard ¶ 1.)

In sum, each of the questions in the *Little* test is answered in the affirmative. Accordingly, under the Utah Supreme Court's analysis, Brigham City's decision not to bury the lines in question is protected by the discretionary function exception to the state Governmental Immunity Act's waiver of immunity for negligence.[9]

The additional facts raised in plaintiffs' brief do not alter that conclusion. Those facts raise purely tangential, nonmaterial issues. (*See* Plaintiffs' Mem. in Opp. at 2–7.) Brigham City's "duty" to plaintiffs, for instance, is irrelevant if Brigham City is immune from suit. Brigham City's painting a yellow center line below the power lines is likewise irrelevant. Nothing in any FAA policy, directive, circular, or contract identified by plaintiffs required the city to mark or bury the power lines in question, regardless whether the roadway beneath them may properly be characterized as a "taxiway" because of its markings. Any other issues raised by the yellow center line simply do not bear on the legal issue raised by the city's motion.

Plaintiffs also assert in their memorandum that the city may be liable for "failure to warn" of the power lines in ways other than marking the lines themselves. This argument fails as a matter of law. The city made a policy-based decision that the power lines did not pose a sufficient hazard to require immediate attention. This was true, in the city's judgment, both in light of the placement of the lines and the purpose for which the taxiway underneath was used, as evidenced by Mr. Leonard's affidavit. The decision to do nothing, or the lack of a decision to do anything, was a necessary result of the discretion the city exercised in determining which conditions on the airport (and elsewhere in the city) most critically needed improvement. To allow the claims in plaintiffs' Second Amended Complaint to go forward under a bootstrapped failure to warn theory would be to second guess the city's discretionary decision and destroy the protection of the exception itself.[10]

Finally, because of the Court's ruling on the city's motion, the Court need not reach the issue of whether plaintiffs' efforts in opposing this motion exceed the bounds of their state administrative notice of claim.

Brigham City is immune from suit under the discretionary function exception to the Utah Governmental Immunity Act's waiver of immunity for negligence.

## IV. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that plaintiffs' claims against the United States are DISMISSED with prejudice. IT IS FURTHER ORDERED that the motion of Brigham City Corporation for summary judgment is GRANTED with prejudice. The Clerk of Court is instructed to enter judgment in Brigham City's favor in accordance with this opinion.

---

9. The city's decision may also be analyzed using the very conclusions arrived at by the *Duncan* court, as spelled out above. First, a basic governmental objective is involved—the promotion of public safety at airports. Second, the evaluation of airport conditions and the assigning of priorities for upgrading those conditions are essential to the improvement of public safety. Third, the city exercised "basic policy evaluation, judgment and expertise" in using its city manager, with input from outside sources, to weigh the degree of hazard associated with the power lines and other conditions and to subsequently assign priorities to those conditions where the greatest hazard exists. Fourth, the city has the necessary statutory authority to determine which conditions are most hazardous and most deserving of the limited resources available. *Cf. Duncan,* 842 P.2d at 835.

10. *Cf. Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1542–43 (10th Cir.1992) (dismissing claim alleging failure to warn of potential hazards emanating from an Army CERCLA cleanup project that was itself "infused with policy implications") (citing *Miller v. United States,* 710 F.2d 656, 665 (10th Cir.) (claim alleging failure to warn of hazardous highway conditions barred under discretionary function exception because highway construction process itself was infused with a "welter of public policy considerations"), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983)).